R. M. McCombs and Emma McCombs, Respondent, v. The Fidelity and Casualty Company of New York, a Corporation, Appellant.—89 S. W. (2d) 114.

St. Louis Court of Appeals.   Opinion filed November 5, 1935.

Opinion Modified; Appellant's Motion for a Rehearing Overruled January 2, 1936.

*G. A. Hodgman* and *Oliver & Oliver* for appellant.

1208.

*Dearmont, Spradling & Dalton* for respondent.

SUTTON, C.—This is an action for damages arising out of a liability insurance policy issued by defendant, Fidelity & Casualty Company of New York, to plaintiff R. M. McCombs, on January 19, 1928, and renewed on January 19, 1929. By said policy the defendant company agreed to insure plaintiff R. M. McCombs in the sum of $5000 against liability imposed upon him by law for damages on account of bodily injury or death suffered by any person or persons as the result of an accident while the policy was in force, and caused by reason of the use, ownership, or maintenance of one 1926 model, six cylinder, Hupmobile sedan, and agreed to defend in the name and

on behalf of the assured any suit brought against the assured to enforce a claim whether groundless or not for damages on account of bodily injury or death, subject to the following conditions:

"A. Upon the occurrence of an accident the Assured shall give immediate written notice thereof, with the fullest information obtainable at the time, to the Company at its home office or to the agent who has countersigned this policy. If a claim is made on account of such accident, the Assured shall give like notice thereof with full particulars. If thereafter any suit is brought against the assured to enforce such a claim, the Assured shall immediately forward to the Company at its home office every summons or other process as soon as the same shall have been served on him. The company reserves the right to settle any claim or suit. Whenever requested by the Company, the Assured shall aid in securing information, evidence and the attendance of witnesses; in effecting settlements; and in prosecuting appeals. The Assured shall at all times render to the Company all cooperation and assistance within his power. . . .

"E. The Assured shall not voluntarily assume any liability; nor interfere in any negotiations or legal proceedings conducted by the Company, on account of any claim; nor, except at his own cost, settle any claim, nor incur any other expense without the written consent of the Company previously given; except that he may provide at the time of the accident, and at the cost of the Company, such immediate surgical relief as is imperative. . . .

"K. The Company shall not be liable to pay any loss nor shall any action be brought against the Company to recover under this policy until a final judgment shall have been recovered against the Assured in a suit covered thereby. . . ."

On November 21, 1929, while the policy was in force, George McClard was operating an automobile north on U. S. Highway 61, in Jefferson County, Missouri. Alice Lunsforth and another were riding with him as guests on that occasion. He drove the automobile off the pavement of the highway onto the dirt shoulder on the east side of the pavement and parked it there for the purpose of providing it with oil and water. The pavement was eighteen feet wide. L. T. Pulliam was the owner of and was operating a motor truck line on said highway 61 between Flat River and St. Louis, and on said occasion he was operating a truck north on said highway, and one George Wisehart was riding in the front seat wth him as a guest. His truck was just in the rear of and about to pass the McClard car. Plaintiff R. M. McCombs was the owner of the sedan covered by the policy, and it was being driven north on said highway by his wife, the plaintiff Emma McCombs. Plaintiff R. M. McCombs was riding with her. They were on their way from Cape Girardeau, where they resided, to St. Louis to visit their daughter. While Mrs. McCombs

was driving the sedan past the Pulliam truck the truck ran off the highway and ran upon McClard who was standing beside his parked car engaged in oiling it, and thereby McClard was knocked down and was seriously and permanently injured. For the injuries thus received McClard instituted an action against the plaintiffs herein and L. T. Pulliam, in the Circuit Court in the City of St. Louis, wherein he sought to recover $20,000 as damages. In that action McClard charged that the sedan in passing the truck collided with the truck, and that the truck was thus thrown off the pavement of the highway and caused to run upon and injure him. Defendant company, pursuant to its policy, undertook to defend that suit. The trial of the suit was had with a jury, and resulted in a verdict in favor of McClard and against the plaintiffs herein for $18.000. A motion for a new trial was filed, a *remittitur* of $5000 was required by the court as a condition for overruling the motion, a *remittitur* of $5000 was entered, the motion for a new trial was overruled, and judgment was given for $13,000. Thereafter McClard agreed to accept $10,000 in full payment of the judgment. Of this the defendant company paid $5000, together with the costs, and plaintiff R. M. McCombs paid the balance.

In the present suit, which is brought to recover by way of damages $5000, the amount of the balance so paid, it is charged that the defendant company negligently and in bad faith refused to settle said McClard suit by the payment of $5000, the face of its policy, before the trial, though admitting the liability of plaintiffs therefor. The trial of the present suit, with a jury, resulted in a verdict and judgment in favor of plaintiff A. M. McCombs for $5000 and in favor of defendant as against plaintiff Emma McCombs. Defendant appeals.

Defendant assigns error here for the refusal of its instruction in the nature of a demurrer to the evidence.

The evidence shows well nigh conclusively that the McCombs sedan in passing the Pulliam truck collided with the truck and thus caused it to leave the pavement, and that at the same time another car traveling south was forced off the pavement to avoid a collision with the sedan as it was passing the truck. This was shown by the testimony of McClard, Pulliam, Wisehart, and a number of other witnesses.

Plaintiffs insisted, however, that the sedan did not collide with the truck, and so testified at the trial of the McClard case. They admitted, however, that following the accident there was a fresh dent and scratch about five inches long on the right rear fender of their sedan, and that on the following day they had the fender repaired in a shop in St. Louis. They did not undertake to account for the damage to the fender except to say that it might have been damaged while parked in Farmington on the day of the accident. They did not

dispute that the truck left the pavement as the sedan passed, or that at or about the same time another car passed traveling south.

When the truck stopped after it ran over McClard, he was found lying under the rear axle. He was taken to a hospital in St. Louis. There an abdominal operation was performed, and it was found he had sustained a rupture of the liver. In performing the operation an incision eight inches in length was made. The evidence shows that at the time of the trial of the McClard case he had a sallow color indicative of liver disturbance. He stood partially stooped. The abdominal scar about eight inches long was tender with some evidence of adhesions. He was more or less restless. There was a weakening of the muscles of the abdominal walls. There were gripping pains which caused him to double up lasting a minute or two caused from liver disturbance. The large muscles of the back were tense and spastic showing tenderness beneath the muscles. He walked in a stooped position. He was not anywhere approaching normal. He wore a supporting belt.

Wayne Ely, an attorney of wide experience, was employed by the Fidelity & Guaranty Company, in February, 1930, to defend the McClard suit.

A. M. Spradling testified on behalf of plaintiffs, as follows: "I am a lawyer. I reside at Cape Girardeau. I am acquainted with Mark Eagleton, Vance Higgs, and Wayne Ely. I called on Mr. Ely at his office in St. Louis in January or February, 1931. I went to see him as Mr. McCombs' personal attorney. Mr. Ely stated that he represented the Fidelity and Casualty Company, and that the Mc-Clard case would likely come up at the next term of court. He told me that from the investigation made by his company Mr. McCombs had no defense in the case, that it did not look like he had a leg to stand on. He told me that Mr. Eagleton represented Mr. McClard, and that he was one of the best, if not the best, damage suit lawyers in St. Louis. He told me he understood McClard had sustained a ruptured liver and some other injuries and had been operated on in the City Hospital. In the course of the conversation he stated that if the McClard case went to trial there would very likely be a judgment in excess of $5,000. I told him I wanted to know what the case could be settled for. At that time I had not discussed with Mr. McCombs the details of the accident. I went home and reported to Mr. McCombs my conversation with Mr. Ely, and in about a week or ten days I went back to St. Louis and saw Mr. Ely again. I told him I had seen Mr. McCombs and that he was very much exercised over the case, and wanted to know if it could be settled. I asked him to try to settle the case, and if necessary to pay $5,000, but he told me the insurance company would not pay $5,000. He said the policy of the company was not to pay the limit of its liability;

that there was always a chance of getting out for less money, and it did not pay the limit. I don't know whether he said absolutely it would not pay the limit, or it was their custom not to pay the limit. I told him McCombs was paying a premium on $5,000, and I did not understand why the insurance company would not be willing to pay the amount of its liability, and he then said, 'An insurance company does not pay the limit of its liability.' I told him that Mr. McCombs stated that if there was a collision between his car and the truck he knew nothing about it. Mr. Ely replied: 'Well, that is all right, but they had a dent on their fender, or their fender was dented, and that is in our report, and they will have a hard time getting away from that dented fender, because that will be used against them in the trial of this case.' I went back to St. Louis on Monday before the trial of the McClard case on Tuesday, March 10th. I asked Mr. Ely if he had gotten in touch with Mr. Eagleton and had reached an agreement about the settlement of this case. He said he had not. I told him again my people were awfully anxious to settle the case. Mr. Ely said he was sure his company would not pay $5,000, because that was the limit of its liability, and there was not any use to submit that proposition because the company would not pay it. He said, 'If the case goes to trial and there is a judgment in excess of that amount we will only have to pay $5,000.' After I had talked with Mr. Ely several times about settling the suit, I met Mark Eagleton, the attorney for the plaintiff, and asked him if he would entertain a proposition for settlement and he said he would. He said he would accept $5,000 in full settlement so far as my clients were concerned and give them a full release. I then got Mr. Eagleton and Mr. Ely together and we had a conversation in front of the courtroom. Mr. Ely, Mr. Eagleton, and Mr. Higgs were present. Mr. Eagleton told Mr. Ely that he would settle the case so far as my clients and his insurance company were concerned and give them a release. Mr. Ely said, 'Do you mean you would do that?' and Mr. Eagleton said, 'Yes, if you will pay me $5,000, I will give you a release and take my chances against the Travelers Insurance Company.' The Travelers Insurance Company was defending Pulliam. Mr. Ely said, 'You are just trying to put me on the spot, Mark.' Mr. Eagleton said, 'No, I will take $5,000. I am authorized by my client and I will take $5,000 and give you a release.' Mr. Ely said, 'Well, I will take it up with my people and see what they have to say about it.' He went away and in a short time came back and said, 'My people won't accept it.' That was before the trial of the McClard case. After Mr. Ely stated that he would not pay this amount, I then prepared and served on him a request in writing to settle the case for the amount that Mr. Eagleton stated that he would accept."·

Vance J. Higgs testified, for plaintiffs, on direct-examination by Mr. Spradling, as follows: "I am engaged in the practice of law, and have been for thirty-three years, in the City of St. Louis. I know Mark Eagleton and Wayne Ely, and knew them in March, 1931. I recall a conversation between Mr. Eagleton and Wayne Ely relative to a case that was pending in which George McClard was plaintiff and Mr. and Mrs. McCombs and L. T. Pulliam were defendants. My recollection is the conversation was just outside the door of the assignment division of the Circuit Court of the City of St. Louis. Mr. Eagleton told Mr. Ely that he would settle the case in so far as the insurance company and Mr. McCombs were concerned upon the payment of $5,000, and Mr. Ely said to him, 'Now, Mark, you are just trying to put me on the spot.' Mark said, 'No, I mean it, and it is in good faith I will settle with you.' Mr. Ely said to him then, 'Will you give me a release?' and he said he would. Something else was said with reference to a telephone call that I don't recall. Mr. Ely went away and I did not see him any more until afterwards in Division No. 1. My recollection is that when Mr. Ely came back he came in Division 1 and made the statement to you, 'It can't be settled.' After he made that statement you made a statement to him of some kind with reference to holding his insurance company responsible."

On cross-examination by Mr. Ely, Mr. Higgs testified as follows: "I believe you said to Mr. Eagleton, 'You are just trying to put me on the spot.' He said, 'No, this is an honest proposition,' or something of that sort. My recollection as to what you said is 'Our policy is for $5,000; we never pay the face value of a policy itself because there is always an element of chance that we might win.' You said you never paid the face value of any policy, or you may have said it was the policy not to pay. What I meant to say by that answer is that you said the policy of your company, on account of the element of chance, was not to pay the face value of the policy. I had a prior conversation with Mr. Spradling in the courtroom. He said to me, 'You have been defending people up here and from these injuries what do you think the verdict would be?' I said from the ordinary average jury in my opinion it will be not less than $12,000 and might be $25,000,' and he said, 'If you could get out of this case for $5,000, what would you do if you had an insurance company?' I said, 'I would insist upon the insurance company paying the full face of the policy, and if it did not do it, I would protect my record.'"

Mark Eagleton testified, for plaintiff, on direct-examination by Mr. Spradling, as follows: "I am a lawyer, and have been practicing in the City of St. Louis since 1916. I know George McClard. I instituted a suit for him in the City of St. Louis against Mr. and

Mrs. McCombs and Mr. Pulliam, in 1930. I tried the case in the Circuit Court of the City of St. Louis. Sid Roach, of the firm of Jones, Hocker, Sullivan and Angert, represented Pulliam. Wayne Ely conducted the defense on the part of Mr. and Mrs. McCombs. The verdict was for $18,000. I recall having a conversation with you before the case was assigned out for trial. I made you a proposition of settlement. I told you I would give your client a complete release for the sum of $5,000, and that I was authorized on behalf of my clients to submit that proposition. I repeated that proposition to Mr. Ely in your presence and at your request. I said to Mr. Ely, 'Wayne, I want you to know that the plaintiff in this case, Mr. McClard, has authorized me to settle this case for $5,000 as against your clients, and that we will then proceed against the Travelers Insurance Company on behalf of its client, Mr. Pulliam.' Wayne said, 'I think you are trying to put me on the spot.' I said, 'No, I am submitting this to you in absolute good faith, because I have been busy all morning trying to get some proposition from the Travelers.' Mr. Ely then asked me what the Travelers were willing to pay, and I told him that the Travelers would not pay more than $1500. Mr. Ely said, 'Well, you are not putting me on the spot anyway, because I have already told my company to make payment of the $5,000, and I so told Mr. Clark, your associate counsel, last week when we took the depositions, but the company doesn't want to do it and it won't pay a dime more than the Travelers.' Mr. Ely said he would, however, call his company. He went away, and when he came back he said the company refused to settle."

Wayne Ely, testifying on behalf of defendant, admitted the conversation between him and Mr. Eagleton respecting the settlement of the McClard case, but denied that he said that his company never paid the face amount of the policy, or that it was the policy of the company not to pay the face amount of the policy. He also admitted that he stated to Mr. Spradling the first time he talked with him about the McClard case that he did not think Mr. and Mrs. McCombs had a leg to stand on, and that he did not think they had any defense to that lawsuit. He stated, however, that at that time his information was that the McCombs sedan had hit the Pulliam truck, and did not know that Mr. and Mrs. McCombs would testify to the contrary. In so stating, however, he was evidently mistaken, for in his subsequent testimony he admitted that he had previously talked to Mrs. McCombs for two or three hours in his office and discussed with her the detailed facts with reference to this accident, and that on that occasion she stated positively that she had not struck the other car; that she never made any other statement to him, but that she always made the statement that her car was not involved in the collision, and so did Mr. McCombs every time he mentioned it to him.

The instant case presents a question of first impression in this State, but the question has been frequently under decision in other jurisdictions, where policy provisions were involved substantially the same as those involved here.

In Douglas v. United States Fidelity & Casualty Co., 81 N. H. 371, 127 Atl. 708, which was a suit by the insured for negligence on the part of the insurer in failing to accept an offer of settlement of a suit against the insured for personal injuries covered by the policy, the court said:

"The fundamental question is, Does or does not the insurer owe to the insured a duty in the matter of a settlement? If it does not owe such a duty, it is not liable either for a failure to act or for the manner of action. It may refrain from completing a settlement for any reason, however, essentially dishonest, and still there would be no liability. If, as the cases roundly state, it has an exclusive and absolute option, no one can question its motives for the exercise or nonexercise of the privilege. No case has gone that far. All acknowledge a liability for fraudulent conduct, or lack of good faith, in refusing to settle. But they are silent as to any reasoning which would sustain such liability and at the same time deny responsibility for negligent conduct.

"The whole question of insurance against loss may be laid out of the case, and still the defendant would be accountable for negligence. It had contracted to take charge of the defense of this claim. That contract created a relation out of which grew the duty to use care when action was taken. The insurer entered upon the conduct of the affair in question. It had an exercised authority over the matter in every respect, even to negotiating for a settlement. It is difficult to see upon what ground it could escape responsibility when its negligence resulted in damage to the party it had contracted to serve. [Attleboro Mfg. Co. v. Company, 240 F. 573, 153 C. A. C. 377.]

"Denial of agency upon the part of the insurer is put upon the ground that, if there were such a relation the insurer would be bound to consider the interests of the insured, when in conflict with its own. It is then said that, when there is such conflict, the insurer may consult its own interests solely. Therefore, it is concluded, there can be no agency.

"This reasoning seems to imply that one party cannot be the agent of the other party. But the law is plainly otherwise. The parties may make that sort of an agreement if they see fit. The result of such a compact is not to leave the promisor free to act as though he had made no promise. On the contrary, his conduct will be subject to closer scrutiny than that of the ordinary agent, because of his adverse interest. The fact that here the insurer stood

to lose but a part of the claim, and that as to the balance the chances of loss growing out of mismanagement of the defense were upon the insured, is an added reason for holding the defendant to the use of reasonable care in the exercise of its exclusive control over the negotiations. Where one acts as agent under such circumstances, he is bound to give the rights of his principal at least as great consideration as he does his own. [Colby v. Copp, 35 N. H. 434, and cases cited; Richards v. Insurance Company, 43 N. H. 263.] The insurer cannot betray the trust it has undertaken nor be relieved from the usual rule that in such a case an agent must serve as he has promised to serve.''

In G. A. Stowers Furniture Co. v. American Indemnity Co. (Tex.), 15 S. W. (2d) 544, which was an action by the insured for negligence and bad faith on the part of the insurer in refusing to accept an offer of settlement of a suit by one Mamie Bichon against the insured for personal injuries covered by the policy, the court said:

''The Court of Civil Appeals, in passing on the issues of this case holds: 'We do not think the indemnity company was, by the terms of the policy, under any obligation to do more than faithfully defend the suit. As before stated, it had not agreed to settle the suit, but had reserved the right to do so. It had the unquestioned right to defend the suit to the end that it might not be called upon to pay a judgment which might be rendered in favor of Miss Bichon.'

. . .

''We, however, are of the opinion that the Court of Civil Appeals was in error in the above holding, and that the better and sounder authorities, and those more in harmony with the spirit of our laws, support a contrary rule. . . .

''As shown by the above-quoted provisions of the policy, the indemnity company had the right to take complete and exclusive control of the suit against the assured, and the assured was absolutely prohibited from making any settlement, except at his own expense, or to interfere in any negotiations for settlement or legal proceeding without the consent of the company; the company reserved the right to settle any such claim or suit brought against the assured. Certainly, where an insurance company makes such a contract; it, by the very terms of the contract, assumed the responsibility to act as the exclusive and absolute agent of the assured in all matters pertaining to the questions in litigation, and, as such agent, it ought to be held to that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business; and if an ordinarily prudent person, in the exercise of ordinary care, as viewed from the standpoint of the assured, would have settled the case, and failed or refused to do so, then the agent, which in this case is the indemnity company, should respond in damages.

"It is true that the policy is for $5,000, so far as this accident is concerned, but when the liability arose against plaintiff the indemnity company was in duty bound to exercise ordinary care to protect the interest of the assured up to the amount of the policy, for the reason that it had contracted to act as his agent, and assumed full and absolute control over the litigation arising out of the accident covered by the policy. The provisions of the policy giving the indemnity company absolute and complete control of the litigation, as a matter of law, carried with it a corresponding duty and obligation, and on the part of the indemnity company, to exercise that degree of care that a person of ordinary care and prudence would exercise under the same or similar circumstances, and a failure to exercise such care and prudence would be negligence on the part of the indemnity company.

"It is the duty of the court to give effect to all the provisions of the policy, and it would certainly be a very harsh rule to say that the indemnity company, in a case such as this, owed no duty whatever to the insured further than the face of the policy, regardless of whether it was negligent in discharging its duties as the sole and exclusive agent of the assured, in full and complete control. Such exclusive authority to act in a case of this kind does not necessarily carry with it the right to act arbitrarily."

The court then quoted with approval what we have just quoted from the Douglas case, and added that in its opinion "the correct rule under the provisions of this policy is that the indemnity company is held to that degree of care and diligence which a man of ordinary care and prudence would exercise in the management of his own business."

In Hilker v. Western Automobile Insurance Co. (Wis.), 231 N. W. 257, which was an action to recover the excess over the coverage of the policy paid by the insured to satisfy judgments rendered in two suits for injuries caused when his automobile struck a child, it was charged that the insurer acted in bad faith toward the insured in failing to make settlement of the suits brought against the insured, and upon the trial of the cause the jury found that the insurer acted in bad faith in failing to make such settlement. On appeal, the court, after reciting the provisions of the policy, said:

"Under such a contract there is no escape from the conclusion that the insurance company became the agent of the insured for the purpose of handling such claims and of conducting such litigation. The determination in Wisconsin Zinc Co. v. Fidelity & D. Co., 162 Wis. 39, 52, 155 N. W. 1081, Ann. Cas. 1918C, 399, that the insurance carrier 'could not be the agent of the insured under such a policy of insurance' must be overruled.

"This determination that the company was not the agent of the

insured was 'put upon the ground that, if there were such a relation the insurer would be bound to consider the interests of the insured, when in conflict with its own. It is then said that, when there is such conflict, the insurer may consult its own interests solely. Therefore, it is concluded, there can be no agency. This reasoning seems to imply that one party cannot be the agent of the other party. But the law is plainly otherwise. The parties may make that sort of an agreement if they see fit. The result of such a compact is not to leave the promisor free to act as though he had made no promise. On the contrary, his conduct will be subject to closer scrutiny than that of the ordinary agent, because of his adverse interest. . . . Where one acts as agent under such circumstances, he is bound to give the rights of his principal at least as great consideration as he does his own. . . . The insurer cannot betray the trust it has undertaken nor be relieved from the usual rule that in such a case an agent must serve as he has promised to serve. The fact that there will be, or may be, conflicting interests is evidence to be considered upon the question of intent to create an agency; but it is of little weight in view of the explicit terms of the present contract. The whole control of negotiations is taken from the insured and given to the insurer. [Douglas v. United States Fidelity & G. Co., 81 N. H. 371, 127 A. 708, 711, 37 A. L. R. 1477, 1482. See, also, Stowers Furniture Co. v. American Indemnity Co. (Tex. Com. App.), 15 S. W. (2d) 544, 547, 548.] . . .

"The defendant company, acting as agent of the plaintiff, contracted to take 'complete and exclusive control of the suit against the assured, and the assured was absolutely prohibited from making any settlement, except at his own expense, or to interfere in any negotiations for settlement or legal proceeding without the consent of the company; the company reserved the right to settle any such claim or suit brought against the assured. Certainly, where an insurance company makes such a contract; it, by the very terms of the contract, assumed the responsibility to act as the exclusive and absolute agent of the assured in all matters pertaining to the questions in litigation, and, as such agent, it ought to be held to that degree of care and diligence which an ordinarily prudent person would exercise in the management of his own business; and if an ordinarily prudent person, in the exercise of ordinary care, as viewed from the standpoint of the assured, would have settled the case, and failed or refused to do so, then the agent, which in this case is the indemnity company, should respond in damages." [Stowers Furniture Co. v. American Indemnity Co. (Tex. Com. App.), 15 S. W. (2d) 544, 547.]

"In Wisconsin Zinc Co. v. Fidelity & D. Co., 162 Wis. 39, 51, 155 N. W. 1081, Ann. Cas. 1918C, 399, this court held that, under

the facts stated in the complaint in that action, the insurance company was not liable to respond in damages for its failure to settle the action because the policy did not expressly impose on the company the duty of adjusting claims. In arriving at this conclusion, the court was doubtless influenced by its erroneous conclusion that the insurance company could not be charged with the duties and obligations of an agent. But the court did recognize the universally accepted rule that an insurance company, in caring for claims made against the assured, is liable for its negligent breach of any legal duty imposed upon it by its contract of insurance or by the law. The court held that 'the power of settlement given the insurer cannot be used for the purposes of fraud or oppression. . . . The power conferred must not be exercised in bad faith.' [Wisconsin Zinc Co. v. Fidelity & D. Co., 162 Wis. 39, 53, 155 N. W. 1081, 1087, Ann. Cas. 1918C, 399.]

"The interests of the insurance company being to so large an extent adverse to those of the plaintiff, its conduct while acting as agent of the plaintiff with reference to these claims must be subjected to close scrutiny in order to determine whether it acted in bad faith toward the plaintiff."

The court held the insurer liable on the ground of bad faith on the part of the insurer in failing to make settlement of the suit brought against the insured.

In Maryland Casualty Co. v. Cook-O'Brien Const. Co., 69 Fed. (2d) 462, the Circuit Court of Appeals approved an instruction of the trial court, as follows:

"If you find that although there was an opportunity to make a reasonable settlement and although there was a probability, under all the facts and circumstances then known or which should have been known, that a judgment might ultimately be had against the Cook-O'Brien Construction Company in excess of the coverage (of the policy); even if you find those facts to be true, if you find that the Maryland Casualty Company did not, in bad faith toward the Cook-O'Brien Construction Company, decline or refuse to make a settlement; then in either of those events your verdict should be for the . . . Maryland Casualty Company. You cannot find against the Maryland Casualty Company upon this issue merely because you think a mistake was made by that Company in not effecting a settlement. You can only find against it if you find it was guilty of bad faith toward the Cook-O'Brien Construction Company. You must understand that the Maryland Casualty Company did not agree to settle any claim. It wasn't bound to settle any claim. It had the right to settle claims if in its discretion that was a wise and proper course, but that discretion was not one which was an absolute discretion. It could not, under all circumstances and in

all cases refuse to settle a claim and go on and try the case. Its discretion was not that wide. It must exercise good faith toward the Cook-O'Brien Company in the matter of effecting settlements."

In Tiger River Pine Co. v. Maryland Casualty Co. (S. C.), 161 S. E. 491, the court quoted with evident approval from the annotations in 34 A. L. R. 727, as follows:

"An insurer which has by the terms of a policy the exclusive right to settle claims arising against the assured, the assured being expressly prohibited in the policy from assuming any liability or interfering in any legal proceedings or negotiations for settlement, must act with good faith towards the assured, and if, by refusing to compromise, the insurer acts with improper motives,—as, to coerce the assured into bearing part of the expense of compromising for a sum within the liability covered by the policy, or slightly in excess thereof, in lieu of taking the risk of a large judgment being recovered, or goes to trial or appeals from an adverse judgment with a view solely to its own interests to the exclusion of the just rights of the assured,—it does so at the peril of probably being held liable for any sum recovered by the claimant, even though in excess of the face of the policy."

What was said in Brassil v. Maryland Casualty Co., 210 New York 235, though the case is not precisely in point on the facts, is not impertinent here, as follows:

"Without attempting to further characterize the defendant's position, it is enough to say that it would be a reproach to the law if there were no remedy for so obvious a wrong as was inflicted upon this plaintiff. His rights, as we have said, go deeper than the mere surface of the contract written for him by the defendant. Its stipulations imposed obligations based upon those principles of fair dealing which enter into every contract. Even the defendant has invoked this implied obligation of good faith and fair dealing not expressed in the terms of its written contract, for by its answer it has set forth that it was incumbent upon the plaintiff to 'deal fairly and in good faith . . . and that he should not voluntarily or knowingly do any acts which would impose or tend to impose on him or on this defendant a loss in the premises.' If this was the plaintiff's duty, it was not less the correlative obligation of the defendant to 'deal fairly and in good faith' with him." [See, also: Cavanaugh Bros. v. General Accident Fire & Life Assur. Corp. (N. H.), 106 Atl. 604; Mendota Elec. Co. v. New York Indemnity Co. (Minn.), 211 N. W. 317; Attleboro Mfg. Co. v. Frankfort Marine, Accident, Plate Glass Ins. Co., 240 Fed. 573; Brown & McCabe v. London Guar. & Acc. Co., 232 Fed. 298.]

The courts are not in agreement in holding the insurer liable for negligence in refusing to settle, but there is no disagreement with

respect to the insurer's liability where bad faith appears. In such case all the courts, without exception so far as we are advised, hold. the insurer liable. All the cases cited and relied on by defendant so hold. For example, in Best Building Co. v. Employers' Liability Assurance Corporation, 247 N. Y. 451, upon which defendant places especial reliance, because the opinion was concurred in by "the now famous Judge CARDOZO, sitting as chief justice," the court said:

"That the insurance company in the handling of the litigation or in failing to settle is liable for its fraud or bad faith is conceded and has been repeatedly stated in all the cases bearing on the subject."

In view of the authorities it remains to inquire whether or not under the facts of the instant case the defendant acted in good faith and dealt fairly with the insured in refusing to settle the McClard suit.

The evidence shows without dispute in the record that plaintiff was knocked down and run over by the Pulliam truck. When the truck was brought to a stop he was found lying under the rear axle. He was taken to a hospital, where an exploratory operation was performed. His abdomen was opened by an incision eight inches in length. A ruptured liver was found. After all that medical and surgical skill could do he was left in a deplorable condition. His sufferings were intense. It was shown without dispute in the record that the truck left the pavement as the McCombs sedan passed, and that at or about the same time another car passed going south, which the evidence shows was also forced off the pavement to avoid a collision with the sedan. It is not disputed that there was a fresh scratch and dent in the right rear fender of the sedan about five inches long, which was repaired in St. Louis on the day following the accident. It was shown by the direct testimony of all the witnesses to the accident, except the insured and his wife, that the sedan collided with the truck. It appears that prior to the trial of the McClard suit, the attorney for the defendant company in charge of the defense, received a *bona fide* offer of settlement of that suit for $5000. The offer was rejected by the company. At that time the attorney had thoroughly acquainted himself with all the facts and circumstances respecting the accident. He knew the witnesses his company would be confronted with at the trial and what their testimony would be. He realized that all the testimony in the case, except the testimony of the insured and his wife, would show that the sedan collided with the Pulliam truck and caused it to leave the pavement. His own statements, as shown by the witnesses, leave no doubt that he regarded the case as a hopeless one for the defense. He knew, it is true, that the insured and his wife claimed that their sedan did not collide with the truck, but he realized that they were obviously mistaken as to this, in view of the freshly dented fender, which was repaired on the

day following the accident. He understood the probative force of this undisputed fact, for he stated to insured's attorney that, notwithstanding insured and his wife claimed that their sedan did not collide with the truck, they would have a hard time getting away from the dented fender. He stated further that they had no defense to the suit, not a leg to stand on, and that there would be a verdict and judgment against them for more than the policy limit. As an experienced attorney he saw nothing but disaster in the trial of the suit, and accordingly advised his company to pay the limit of the policy in settlement of the suit. Still the company refused to settle, putting its refusal on the ground that there was an element of chance that the insured might win, and that it was the policy of the company never to settle for the limit of its liability. In so doing the company obviously ignored its obligations arising from the agential relationship between itself and the insured created by its contract. It is difficult to escape the conclusion that the company proceeded on the theory that by the terms of the contract it had the insured tied hand and foot, and thereby sought to coerce the insured into contributing a portion of its own liability in settlement of the suit so as to avoid being compelled to pay a larger sum through a verdict and judgment which every one concerned realized would result from a trial of the suit, unless by chance the insured might win. The evidence of bad faith on the part of the defendant in refusing to settle is ample. It is manifest that a submissible case was made out on that issue. The instruction in the nature of a demurrer to the evidence was properly refused.

St. Joseph Transfer and Storage Co. v. Employers' Indemnity Corp. (Mo. App.), 23 S. W. (2d) 215, relied on by defendant, is not in point here. In that case there was a compromise agreement between the insured and the insurer, whereby the insured agreed to pay a part of a settlement and the insurer the balance, and it was held that the compromise agreement was binding, and that the insured was not entitled to recover from the insurer the amount of his contribution to the settlement. There was no such agreement in the present case. That case is also otherwise clearly distinguishable on its facts from the present case.

The Commissioner recommends that the judgment of the Circuit Court be affirmed.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court. The judgment of the Circuit Court is accordingly affirmed. *Hostetter, P. J.,* and *Becker* and *McCullen, JJ.,* concur.