# SOUTHERN FIRE & CASUALTY CO. v. NORRIS.—
## 250 S. W. (2d) 785.

Eastern Section.   January 14, 1952.

Petition for Certiorari denied by Supreme Court, June 7, 1952.

658

Donaldson, Montgomery & Kennerly, of Knoxville, and Goodpasture, Carpenter & Dale, of Nashville, for plaintiff in error.

Poore, Cox, Baker & McAuley, of Knoxville, for defendant in error.

McAMIS, J.   This is an action by an insured under a garage liability policy to recover an amount in excess of the policy limit, claimed to be due by reason of the negligence and bad faith of the insurer in failing to compromise and settle the claim of James L. Davis.   It is conceded that the insurer engaged competent attorneys to defend the suit and after the Davis judgment for $25,000 became final on appeal that it paid all costs and counsel fees and $10,000, the limit of its liability under

the policy, with interest to date of payment. Plaintiff's insistence is that the Company had an opportunity to settle the claim within the policy limit before the trial and negligently and in bad faith declined to do so.

The trial court instructed the jury that no verdict could be rendered solely on a showing of negligence in the investigation of the claim and in negotiating, attempting to negotiate or failure to negotiate a compromise of the Davis claim though such negligence, if shown, could be considered in determining the existence of bad faith. That term the Court defined as conveying the "idea of willingness to gamble with the insured's money in an attempt to save its own money" or "as an intentional disregard of the financial interests of the plaintiff in the hope of escaping full liability imposed upon it by its policy".

This definition was followed in the charge by instructions: (1) That good faith required the Company to investigate the claim to such an extent that it would be in position to exercise an honest judgment as to whether the claim should be settled; (2) That the material question was not what the actual facts were but what facts relative to the accident and injuries to Davis were known to the insurer and its agents "which they should have considered in deciding whether it should or should not settle an action brought against the insured as the reasonable thing to be done"; (3) That a mere mistake of judgment would not constitute bad faith; (4) That while the right of the insurer to control negotiations for settlement must be subordinated to the purpose of the contract to indemnify the insured to the limit of the policy, there must be bad faith with resulting injury to the policy holder before a cause of action accrues; (5) That if the insurer dealt fairly with the insured and acted honestly

and according to its best judgment it would not be liable; (6) That it owed its insured no duty to settle merely because a settlement could be made within the limits of the policy.

It will be noted that the charge placed the burden on the insured of establishing bad faith and a dishonest motive before recovery could be allowed. On this charge the jury returned a verdict for $17,500. The trial judge suggested a remittitur of $2,500 and approved a judgment for $15,000. The defendant insurer has appealed insisting as its primary contention that there was no material evidence of bad faith on its part and that the court should have directed a verdict in its behalf at the close of all the evidence. We hold that under a proper analysis of the evidence the questions of bad faith and proximate cause were for the jury.

On March 26, 1947, while the policy was in force and effect, the plaintiff was a used car dealer in Knoxville, Tennessee. He had in his employ as a driver Daniel Briscoe Cox. On that date Cox and two other drivers were directed to take three of plaintiff's cars through Chattanooga to a sale in Georgia. They left Knoxville early in the morning and were proceeding along Brainerd Road, a four lane thoroughfare, entering Chattanooga, at about 7 A. M., when they overtook from the rear a small truck owned and operated by F. D. Howard. Davis and one Bishop, passengers of Howard, were riding in the cab of the truck. There was no evidence of a joint enterprise between the occupants of the truck, though that theory was advanced on the trial of the Davis suit.

Cox, driving the front car, struck the truck from the rear knocking it off the pavement and causing it to overturn and severely injure Davis. The other two drivers of plaintiff's cars did not see the collision though they ar-

·rived at the scene almost immediately after it occurred. Cox was arrested and charged with reckless driving, a charge of which he was later found not guilty in the Criminal Court of Hamilton County. While defending this charge he was served with process in three damage suits instituted in the Circuit Court of Hamilton County by the three occupants of the truck and counterpart summons issued to Knox County for the insured, hereinafter referred to as plaintiff.

Plaintiff had spent the preceding night in Chattanooga. Upon learning of the accident he contacted defendant's Knoxville office and was directed to contact Mr. Cantrell, defendant's Chattanooga adjuster. Cantrell went to the scene of the accident, arriving there about 11 A. M. of the day of the accident. He took a statement from Cox and the two drivers of plaintiff's cars who were following Cox. He took no other statements. Although a newspaper account of the accident appearing in a Chattanooga paper the next day indicated that a taxi driver named McMurray had radioed ·information that the accident had occurred, defendant knew nothing of this witness until two or three days before the trial when a subpoena carrying his name was examined by defendant's attorney. There is evidence that it is a common practice among adjusters and attorneys to watch the newspapers following a serious accident for names of witnesses and other information of value in adjusting or defending claims.

A transcript of the evidence and various proceedings in the Davis suit was filed in this case. Honorable Joe V. Williams, Jr., of the Chattanooga Bar was engaged by defendant to defend the Circuit Court actions against plaintiff. The record shows that he conducted a vigorous defense of the Davis suit. A plea in abatement was filed charging a fraudulent conspiracy to bring plaintiff with-

in the jurisdiction of the Circuit Court of Hamilton County though the medium of the prosecution of Cox for reckless driving. A motion was also made to disqualify Davis' counsel in the damage suit because of their connection with that prosecution. When both of these maneuvers proved unsuccessful a wayside bill of exceptions was preserved as a basis for review on appeal. A vigorous defense was made on the merits but the case went to trial without any eyewitness testimony for defendant except that of Cox himself. Davis, by contrast, in addition to his own testimony had the testimony of Howard, the driver of the truck, and McMurray. (He also offered Bishop as a witness to show that he had been rendered infamous.) These witnesses all testified that the truck was in the outside (north) lane traveling west at about 25 miles per hour when it was struck without warning from the rear by the car driven by Cox. The testimony of Cox carried an inherent weakness, if not positive incredibility. According to his testimony the Howard truck suddenly cut to its left and came to a sudden stop in front of him as he was in the act of overtaking and passing it. It was shown without dispute that there was no reason for Howard to cut to his left or, having done so, to come to a sudden stop. In addition Cox admitted that he was still 50 feet away when this occurred and that he made no effort to cut back to the north lane to avoid striking the truck, insisting that he did not have time to do so. Any negligence of Howard would not be imputable to Davis and, as might well have been anticipated, the result on the issue of liability was adverse to plaintiff herein, defendant in that case.

On the question of the extent of Davis' injuries the medical testimony for Davis showed that he had suffered a fracture of the femur which had failed to knit and that

he was permanently and totally disabled. No medical testimony was offered to refute Davis' proof as to the to the extent of his disability. He was shown to have had an earning capacity of $7 per day prior to the injury with no physical disability except possibly an inactive tuberculosis of the lungs. It is important to note here the defendant had previously been furnished a report of Davis' medical witnesses and knew what their testimony on the trial would likely be.

With this case background in mind we consider defendant's efforts to investigate and settle the claim. It appears that the defense was turned over to Mr. Williams in May 1947 at about the same time he was employed by Cox in the reckless driving prosecution. Up to that time the claim had been handled by Mr. Cantrell, the adjuster already mentioned. Aside from what counsel learned about the claim through representing Cox in the criminal case nothing transpired to further the defense of the Davis suit until early in March preceding the trial which began on the 30th day of March, 1948. No effort was made to have Davis examined or to learn the extent and exact nature of his injuries which defendant all along seems to have regarded only as the ordinary case of a broken leg or injured hip and a claim of anything more serious as merely an exaggeration for the benefit of the trial.

Finally, on March 18, 1948, by agreement with Davis' counsel he was examined by Dr. Killifer and, on March 20th, his report, showing total disability, was mailed by Mr. Williams to defendant's Knoxville office. About the same date another report, based on X-ray, and indicating an active tubercular condition was mailed to defendant. Apparently, though recognizing that this might "cut both ways" since it might be urged that the tubercular condi-

tion had been made active by the injuries received in the accident, defendant seized upon this as a possible basis for settling the case for less than the limit of its liability under the policy. However, the physician who made the report was not used as a witness on the trial.

As to a possible compromise of the claim nothing was done before March except that there were some casual discussions between Mr. Williams and Davis' counsel. The figure used by counsel for Davis had been $19,500. But about "a week or two" before the trial they offered to accept a settlement of $9,500. This was understood by Mr. Williams as an offer to "recommend" a settlement. On March 22, 1948, the offer was transmitted by long distance to the claim attorney at defendant's home office. It does not appear that Mr. Williams was asked for an opinion as to settlement. He was instructed to offer $7,500 but was given no authority to offer more. This was declined the following day and the next day the $9,500 offer was withdrawn and a new offer made to settle for $12,000.

Plaintiff, as the insured, knew nothing of these offers or of the reports showing a condition of total and permanent disability of Davis until a day or two before the case was set for trial. He testified that the only information he had received from defendant was a letter dated March 22, 1948, advising that the Davis suit was for more than $10,000 and that he was at liberty to employ counsel if he so desired.

A day or two before the case was set for trial plaintiff, upon inquiry made by counsel of his own selection, was told for the first time that the claim could have been settled for $9,500. At the same time he was told that it could still be settled for $12,000 and defendant, as insurer, offered to pay $10,000 of this amount if plaintiff would

pay the additional $2,000. According to evidence most favorable to plaintiff he declined because of financial inability to raise the necessary amount. Defendant did not, at any time, make known to Davis' counsel that it would pay $10,000 in settlement of the claim. The only reason offered for not doing so was the statement of counsel for Davis made some days before the trial that the case could not be settled for less than $12,000.

It is clearly shown that when defendant declined to accept the offer to settle for $9,500 or to pursue the offer to recommend such a settlement if it so understood the offer, it had before it evidence that Davis would be able to show on the trial a condition of total and permanent disability and that a great preponderance of the evidence would show a case of liability. In view of these circumstances and the counter offer of only $7,500 it was within the province of the jury to decide whether the $9,500 offer was rejected and whether good faith required defendant to make known to Davis' counsel its willingness to pay the policy limit in the hope of saving its insured from having to pay a much larger verdict especially in view of Davis' offer to settle only a few days earlier for $500 less than the policy limit.

The jury, as to the triers of the facts, may have concluded that defendant had become resigned to the probability of having to pay $10,000 and was indifferent to the effect of its failure to compromise upon its insured. We cannot say under all the evidence and the inferences most favorable to plaintiff that there is no reasonable basis for such a conclusion. Defendant had neglected to learn Davis' true condition until a trial was imminent and had failed to learn of the existence of a most material witness. It had declined to accept an offer of compromise within the limits of its policy liability and, failing to advise plaintiff of the offer, had authorized a

counter offer of such an amount that Davis apparently considered it a rejection of his own offer which he promptly increased to $12,000. Although then fully aware of the seriousness of its insured's position both on the issue of liability and the probable amount of the recovery and although willing to pay $10,000 it made no further effort to compromise and proceeded to trial suggesting that plaintiff pay $2,000 and settle on the basis of Davis' last offer.

We recognize the full weight of defendant's insistence that hindsights are always better than foresights and that counsel placed in such a plight are not required to have the gift of prophecy. We are aware also of the delicacy of the relationship between insurer and insured in cases of this kind. The insurer is under no duty to compromise a claim for the sole benefit of its insured if to continue the fight offers a fair and reasonable prospect of escaping liability under its policy or of getting off for less than the policy limit. The insured surrenders to the insurer the right to investigate and compromise or contest claims knowing that, in event of a claim, the insurer will have its own interests to consider. But an insured also has a right to assume that his interests will not be abandoned merely because the insurer faces the prospect of a full loss under the policy. The relation is one of trust calling for reciprocity of action. The insured owes the duty of full co-operation—the insurer the duty of exercising good faith and diligence in protecting the interest of its insured.

The courts seem to be unanimous in holding an insurer liable in tort for an excess over the policy limit where as here it has exclusive control over investigation and settlement of claims and its refusal to settle within the policy limit is fraudulent or in bad faith.

In Aycock Hosiery Mills v. Maryland Casualty Co., 157 Tenn. 559, 569, 11 S. W. (2d) 889, 892, the court said:

"An insurer assuming under its policy to control litigation against the insured must act in good faith and with reasonable diligence and caution. Douglas v. United States Fidelity & Guaranty Co., 81 N. H. 371, 127 A. 708, 37 A. L. R. 1477. That obligation attended the contract and liability for breach of the obligation arises out of the injurious conduct of the insurer who assumed to act under the contract. 34 A. L. R., Note, p. 738, and cases cited; Anderson v. [Southern] Surety Company, 107 Kan. 375, 191 P. 583, 21 A. L. R. 761; Attleboro Mfg. Co. v. Frankfort Marine [Accident & Plate Glass] Insurance Co., (C. C.) 171 F. 495."

To the note at 34 A. L. R. 738, may now be added supplemental cases annotated at 37 A. L. R. 1484; 43 A. L. R., 329; 71 A. L. R., 1485 and 131 A. L. R., 1499, with separate sections in each dealing with the duty to compromise.

In Aycock Hosiery Mills v. Maryland Casualty, supra, while the evidence of bad faith was stronger than in the present case liability in tort was sustained because the insurer persisted in litigating a claim under the Workmen's Compensation Act, Code, Sec. 6851 et seq., which could have been settled for a relatively small sum, refusal to settle finally resulting in a common law action and judgment against the insured for a much larger sum. The measure of damage was determined as the difference between what it would have cost the insurer to settle the compensation claim and the judgment rendered against the insured in the common law action.

The cases covered in the notes, supra, establish the prevailing rule that the right to control investigation, settlement and litigation of claims must be subordinated

to the insurer's contractual duty to indemnify the insured against loss; that the insurer cannot escape liability by considering only what appears to be for its own interest. It must consider also the impact of its decision upon its insured and deal fairly and in good faith. This duty arises not so much under the terms of the contract but is said to arise because of the contract and to flow from it.

It is held, we think correctly, that, in order to honestly discharge its duty to compromise within the policy limits, an insurer must exercise ordinary care and diligence in the investigation of the accident and the extent of the damage for which the insured may be held liable. American Mutual Liability Ins. Co. v. Cooper, 5 Cir., 61 F. (2d) 446. As said by the Wisconsin Court in Hilker v. Western Automobile Ins. Co., 204 Wis. 1, 231 N. W. 257, the manner in which the insurer investigated the case and prepared it for trial has an important bearing upon the question of bad faith in refusing or failing to settle the claim. This is merely saying that circumstantial evidence may be used to establish bad faith and that negligence in investigation and failure to keep insured advised is suggestive of indifference to the trust imposed by the policy which, in turn, may raise an inference of bad faith. How can an insurer fairly consider its duty to settle without knowing who the witnesses are, what they will testify and how seriously the claimant has been injured? Certainly these are circumstances which may influence a jury in its deliberations.

If the proof, in the light of all the relevant circumstances, and inferences to be drawn therefrom is such as to leave a reasonable basis for disagreement among reasonable minds, the question of good faith of the insurer in the handling of the claim and conducting compromise negotiations is for the jury. Tyger River

Pine Co. v. Maryland Casualty Co., 170 S. C. 286, 170 S. E. 346, 348; Maryland Casualty Co. v. Cook-O'Brien Const. Co., 8 Cir., 69 F. (2d) 462; McCombs v. Fidelity & Casualty Co., 231 Mo. App. 1206, 89 S. W. (2d) 114; Highway Insurance Underwriters v. Lufkin-Beaumont Motor Coaches, Inc., Tex. Civ. App., 215 S. W. (2d) 904; Maryland Casualty co. v. Elmira Coal Co., 8 Cir., 69 F. (2d) 616; Johnson v. Hardware Mutual Casualty Co., 109 Vt. 481, 1 A. (2d) 817; Noshey v. American Automobile Ins. Co., 6 Cir., 68 F. (2d) 808.

It is earnestly argued, however, that plaintiff failed to prove any damage to himself as a result of bad faith on the part of the defendant since he admitted in his testimony that he has no property out of which Davis can obtain satisfaction of the judgment. The court of last resort in New Hampshire and the Circuit Court of Appeals for the 4th Circuit appear to hold this view. Dumas v. Hartford Accident and Indemnity Co., 92 N. H. 140, 26 A. (2d) 361, 362; State Automobile Mutual Ins. Co. v. York, 104 F. (2d) 730, 734. Norwood v. Travelers Ins. Co., 204 Minn. 595, 284 N. W. 785, 131 A. L. R. 1496, is also cited in the supporting brief as supporting this view. That case, however, merely referred to the financial condition of the insured as bearing on the question of proximate cause. The question here presented of the necessity of paying the judgment as a condition precedent to suit was not considered.

The courts of Wisconsin and Texas are aligned with the contrary view. Schwartz v. Norwich Union Indemnity Co., 212 Wis. 593, 250 N. W. 446; Universal Automobile Ins. Co. v. Culberson, Tex. Civ. App., 54 S. W. (2d) 1061; American Indemnity Co. v. Fellbaum, Tex. Civ. App., 225 S. W. 873; General Accident Fire, etc., Co.

v. Butler's Ice Cream Factory, Tex. Civ. App., 291 S. W. 674.

The latter cases, it seems to us, are supported by the sounder reasoning. The contrary view, while logical in the abstract, only serves as a windfall to an insurer fortunate enough to have insured an insolvent. The insurer in such a case stands in the position of having been derelict in the performance of its duty under a policy for which it accepted a premium paid by the insured in good faith. The liability, though ex delicto, as we have seen, arises out of the contract. If the insured had not felt the need of the protection offered by the policy and the services of the Company in handling claims against him it is to be assumed he would not have taken the policy. The claim is now an adjudged liability which he can escape only by a discharge in bankruptcy or by payment. If he chooses the former course his credit is impaired. If he does not the outstanding judgment against him is likely to prove an insurmountable barrier to payment. If prepayment is required in cases of this kind the insurer is likely to be less responsive to its trust duties in cases where the insured is insolvent than in cases where the insured is able to discharge any judgment in excess of the policy limit which may be rendered against him.

In rejecting the view here urged by the insurer the Supreme Court of Wisconsin in a well reasoned opinion in the Schwartz case, supra, said [212 Wis. 593, 250 N. W. 446]:

"One who has been subjected to a judgment by reason of fraud practiced upon him by another standing in the relation of insurer is entitled to relief even though he has not paid the judgment. A cause of action in his favor arises and his damage occurs

when the liability becomes thus fixed. Neither the right of action nor the measure of damages depends upon the fact of payment. It is enough if by reason of the appellant insurer's fraud the respondent must submit to a liability to pay and the precise sum which he is liable to pay is known or ascertainable, for then there is no difficulty in fixing the amount of damages. Liabilities resulting from tortious acts are included in damages when they become certain. And borrowing a phrase from 2 Sutherland on Damages, p. 615, in his Treatise on the Law of Damages, embracing the elementary exposition of the law applicable to particular subjects of contract and tort published in 1884, he is 'to be morally and legally exonerated by payment; not merely to be indemnified in a perpetual delinquency to his creditor.' "

As supporting its conclusion the Court assimilated the problem to cases in tort actions for personal injuries respecting the prepayment of medical bills claimed as an element of damages, the rule in such cases being that where the liability for such expenses is fixed and definite prepayment is not necessary. 25 C. J. S., Damages, Sec. 47, page 527.

A further insistence of defendant is that plaintiff should not recover because he failed to mitigate his damages by paying $2,000 which, added to the $10,000 which defendant was willing to pay, would have enabled him to accept Davis' last offer to settle for $12,000. We think this would be a valid defense if it should appear that plaintiff was in such financial condition that he could have done so. But the burden of proof was upon defendant to show that by the exercise of reasonable effort and care plaintiff could have met the requirement of this offer and thereby mitigated his damages. Ple-

sofsky v. Kaufman & Flonacker, 140 Tenn. 208, 216, 204 S. W. 204, 206, 1 A. L. R. 433 and cases cited. That case involved the liability of the seller for failure to deliver goods on credit as agreed and the duty of the buyer to excuse his failure to mitigate his damages by showing an inability to borrow enough money to pay cash. The opinion of Mr. Justice Williams dealt with the question of the burden of proof by saying::

"If this were not the rule applicable in the pending case, we would have the law requiring the injured buyer to dam his credit by pleading and adducing proof that he was without cash or the credit that was requisite to raise the cash which could alone bring the suggested mitigation; and this, for the protection of the guilty party."

There is not only no proof that plaintiff was financially able to take advantage of this belated offer but every inference from the proof is to the contrary.

■■ ■■ It is next insisted that the court erroneously charged the jury that defendant could be held liable for failure to compromise upon a showing of negligence as distinguished from bad faith. While certain portions of the charge tend to support this insistence, we think, when construed as a whole the charge laid down the rule in plain language that while any negligence of defendant in connection with the investigation of the claim could be considered as bearing on the good faith of defendant in failing to compromise, negligence in failing to compromise would not be sufficient to impose liability. We quote: "It takes more than negligence alone to render the defendant liable." And, "The defendant company wouldn't be liable for negligence alone in failing to make a settlement * * * There must be bad faith * * *. " In our opinion there was no error in defining the standard

of conduct in investigating the claim, as distinguished from settlement, as that of an ordinarily careful and prudent person. In view of the charge requiring a showing of bad faith in failing to settle within the policy limit there is no occasion to consider whether the negligence rule should have been applied to that aspect of the case.

It is universally held that portions of the court's charge to the jury are to be considered and construed contextually. Each portion is to be construed as a part of the whole—never in isolation. Provident Life & Accident Ins. Co. v. Prieto, 169 Tenn. 124, 83 S. W. (2d) 251; Letellier-Phillips Paper Co. v. Fiedler, 32 Tenn. App. 137, 222 S. W. (2d) 42.

Other questions made by the assignments are controlled by what has been said or have been independently considered and found without merit. To attempt to cover each separately would not be practical. We find no error and it results that the judgment must be affirmed with costs.

Howard, J., concurs.

Hale, J., (dissenting).

I dissent, believing the evidence insufficient to warrant a finding of bad faith by the insurer in the defense of the Davis case.

(a) It was not bad faith for the insurer to accept at face value the statement of Daniel Briscoe Cox, the agent for and co-defendant with Norris, and make defense upon that basis.

(b) It was not bad faith for Cantrell to fail to read the newspaper account of this accident wherein mention was made of the witness McMurray. In this connection it is interesting to note that McMurray was not used as a witness in the criminal case against the said Cox.

(c) It was not bad faith for having delayed obtaining medical testimony until shortly before the trial. According to the undisputed testimony of Ross Stuart, claims attorney for the insurer, the rule prevailing in Hamilton County allows only one medical examination which, of course, makes it highly desirable to have it as near the time of trial as is possible.

(d) It was not bad faith on the part of Mr. Williams to file a plea in abatement to the jurisdiction. Although this plea was not sustained there were some indications that the criminal prosecution of Cox in Hamilton County was simply a ruse to get him back there so that he might be sued civilly with counterpart process to Knox County for Norris. Both the insured and the insurer were very anxious to avoid a trial in Hamilton County.

(e) It was not bad faith for Mr. Williams to have made the abortive effort to disqualify opposing counsel, although this was not authorized by the record. Certainly no prejudice resulted to Norris.

(f) It was not bad faith to have delayed making propositions of compromise. We cannot blind our eyes to the prevailing custom of waiting until nearly trial time before instituting negotiations for settlement. As a rule the longer a damage claim is pending the softer it gets, as is shown by the reduction of the Davis claim from $19,500 to $9,500.

(g) It was not bad faith for Mr. Williams to have misunderstood that the offer made by Mr. Hite was to "recommend" a settlement for $9,500, even though Mr. Hite and Major Whittaker both testify this was a "firm" offer. Mr. Williams understood it was an offer to "recommend" this sum as is shown by his conversation with Mr. Stuart, and both then acted in good faith upon that understanding, even though it might have been erroneous.

Having in mind the frailty of human memory, especially after the lapse of considerable time, this could not be the basis of an inference of bad faith. Stuart authorized and Williams made a firm offer of $7,500 in an effort to get opposing counsel to make a counter-offer which was then upped to $12,000.

(h) Nor was it bad faith on the part of Mr. Williams to have exhibited what may be termed as excessive zeal in the conduct of the trial. A good trial lawyer must believe in his client's cause, and although this partisanship may have in it elements of weakness in blinding him to the strength of the opposition, it cannot be termed bad faith.

As I see it, the entire strength of the case of the plaintiff below is based upon hindsight and second guessing, which is far different from the bad faith that should be required as a basis for liability in cases of this nature.

I would reverse and dismiss.