**TENNESSEE FARMERS MUTUAL INSURANCE COMPANY, Appellant,**

v.

**Therion Omer WOOD, Appellee.**

**No. 13895.**

United States Court of Appeals
Sixth Circuit.

April 6, 1960.

Weick, Circuit Judge, dissented.

John S. Porter, of Burch, Porter, Johnson & Brown, Memphis, Tenn., Owens & McLain, Memphis, Tenn., on brief, for appellant.

Edward P. A. Smith, of McDonald, Kuhn, McDonald & Crenshaw, Memphis, Tenn., for appellee.

Before McALLISTER, Chief Judge, and CECIL and WEICK, Circuit Judges.

### McALLISTER, Chief Judge.

Appellant, Tennessee Farmers Mutual Insurance Company, executed a policy of insurance with Therion Omer Wood, appellee, insuring him against liability for damages arising out of injuries to third persons as a result of the operation of his automobile. The limits of liability of the insurance company to Wood were $5,000 for injuries to each person in an accident, with a maximum liability of $10,000 for each accident, including bodily injury and property damage.

On the evening of May 13, 1957, in Memphis, Tennessee, appellee Wood collided with an automobile driven by Mrs. Sewell Avery. The collision forced Mrs. Avery's car off the road into an electric-light pole, resulting in injuries to her and to her husband, who was riding beside her, as well as considerable damage to her car. The Averys sued appellee Wood for negligence and appellant insurance company defended the suit. As a result of the trial, a jury returned a verdict in the amount of $15,000 for personal injuries to Sewell Avery; $1,000 for personal injuries to his wife, Alma Avery; and $693.32 for damages to the Avery automobile—or a total of $16,693.32, upon which judgment was entered.

Appellant insurance company, after the judgment in the suit brought by Avery, paid into court the total of its liability under the insurance policy, namely, $5,000 on the judgment awarded Sewell Avery; $1,000 for the judgment awarded Alma Avery; and $693.32 for the judgment for damages to the Averys' car—or an aggregate of $6,693.32. Payment of this amount into court after the judgment left Wood still indebted to Sewell Avery in the amount of $10,000, which was the amount of the judgment awarded, less the amount which the insurance company paid into court as the limit of its policy for the Averys' injuries. In other words, although the judgment in favor of Avery was $15,000, the insurance company paid into court only $5,000, which was the policy limit for injuries to one person.

Wood then brought suit against the insurance company for $10,000, the amount of the judgment in favor of Avery over and above the amount paid by the insurance company for Avery's injuries, inasmuch as Wood is presently a judgment debtor to Avery in the amount of $10,000. The case was tried before a jury in the District Court and Wood was awarded a verdict in the amount of $10,000 against the insurance company, upon which judgment was entered, after the District Court had overruled a motion for judgment notwithstanding the verdict. From the judgment, the insurance company has appealed.

On appeal, the insurance company contends that it defended the suit in good faith; that, in good faith, it refused to compromise or settle the Avery claims within the limits of liability of its policy; that the insurance company resisted the suit of the Averys in good

faith and in the reasonable belief that its defense of the suit offered a fair prospect of escaping liability under its policy, or of getting off for less than the policy limits. The insurance company further contends that Wood, its insured, was guilty of collusion with the Averys, and that he failed to cooperate with the insurance company in defending the suit, thereby breaching the policy provisions and relieving the insurance company of its liability thereunder.

The insurance company, therefore, submits that the District Judge was guilty of reversible error in submitting to the jury the question of its good faith in refusing to settle the Avery claim; that the District Judge was guilty of reversible error in submitting to the jury the question whether appellee Wood was innocent of collusion, and also the question whether or not he cooperated with the insurance company in the defense of the suit; and that, accordingly, the District Judge was guilty of reversible error in not entering a judgment of no cause of action in favor of the insurance company.

Wood, the appellee, contends that the insurance company, having control of the defense of the suit which was brought against him by the Averys, was guilty of bad faith in failing and refusing to settle the case within the limits of the policy of insurance; that, because of its bad faith, he was subjected to a judgment of $10,000 in excess of the limits of the policy; that his indebtedness, as a judgment debtor, is due to the bad faith of the insurance company; that he cooperated with the company in the defense of the Avery suit; and that the judgment in the amount of $10,000 rendered in his favor by the District Court, which was awarded to him in order to save him harmless from the Avery judgment, should be affirmed.

The issue on appeal is whether the District Judge was guilty of reversible error in submitting the case to the jury. Much of the controversy before us depends upon questions of law; and, before discussing the facts, an outline of the applicable law may be helpful for an understanding of the case.

■ Automobile liability insurance policies usually reserve to the insurer the decision whether an offer to compromise a claim against the insured should be accepted. So a conflict in the interests of the insurer and the insured may arise where there is an action or claim against the insured for an amount in excess of the policy coverage and an offer to compromise this claim for the policy limit or for a figure slightly below such limit. An insurer, having assumed control of the right of settlement of claims against the insured, may become liable in excess of its undertaking under the policy provisions, if it fails to exercise good faith in considering offers to compromise the claim for an amount within the policy limits; and it is liable for an excess over the policy limit, where it has exclusive control over the investigation and settlement of claims, and its refusal to settle within the policy limit is in bad faith. Aycock Hosiery Mills v. Maryland Casualty Co., 157 Tenn. 559, 11 S.W.2d 889; Vanderbilt University v. Hartford Accident & Indemnity Co., D.C.Tenn., 109 F.Supp. 565, 6 Cir., 218 F.2d 818; Southern Fire & Casualty Co. v. Norris, 35 Tenn.App. 657, 250 S.W.2d 785; Traders & General Ins. Co. v. Rudco Oil & Gas Co., 10 Cir., 129 F.2d 621, 142 A.L.R. 799; Roberts v. American Fire & Casualty Co., D.C.Tenn., 89 F.Supp. 827, affirmed 6 Cir., 186 F.2d 921; Noshey v. American Automobile Ins. Co., 6 Cir., 68 F.2d 808; Tennessee Farmers Mutual Ins. Co. v. Hammond, Tenn.App., 306 S.W.2d 13.

■ While an insurance company may, in determining whether to accept or reject an offer of compromise, properly give consideration to its own interests, it must, in good faith, give at least equal consideration to the interests of the insured and if it fails so to do, it acts in bad faith. American Fidelity and Casualty Co. v. G. A. Nichols Co., 10 Cir., 173 F.2d 830.

■ "The right to control the litigation in all of its aspects carries with it

the correlative duty to exercise diligence, intelligence, good faith, honest and conscientious fidelity to the common interest of the parties. * * * When the insurer undertakes the defense of the claim or suit, it acts as the agent of its assured in virtue of the contract of insurance between the parties, and when a conflict of interest arises between the insurer, as agent, and assured, as principal, the insurer's conduct will be subject to closer scrutiny than that of the ordinary agent, because of his adverse interest." Traders & General Ins. Co. v. Rudco Oil & Gas Co., 10 Cir., 129 F.2d 621, 627, 142 A.L.R. 799.

In Aycock Hosiery Mills v. Maryland Casualty Co., 157 Tenn. 559, 11 S.W.2d 889, 892, the Supreme Court of Tennessee held that an insurer assuming, under its policy, to control litigation against the insured, must act *"in good faith* and with reasonable diligence and caution." "That obligation," said the Supreme Court of Tennessee, "attended the contract, and liability for breach of the obligation arises out of the injurious conduct of the insurer who assumed to act under the contract."

In Southern Fire & Casualty Co. v. Norris, 35 Tenn.App. 657, 250 S.W.2d 785, 790, it was said:

"The courts seem to be unanimous in holding an insurer liable in tort for an excess over the policy limit where as here it has exclusive control over investigation and settlement of claims and its refusal to settle within the policy limit is fraudulent or in bad faith. * * *

"The cases * * * establish the prevailing rule that the right to control investigation, settlement and litigation of claims must be subordinated to the insurer's contractual duty to indemnify the insured against loss; that the insurer cannot escape liability by considering only what appears to be for its own interest. It must consider also the impact of its decision upon its insured and deal fairly and in good faith. This duty arises not so much under

the terms of the contract but is said to arise because of the contract and to flow from it."

■ " '[The] insurer must act honestly to effectively indemnify and save the insured harmless as it has contracted to do—to the extent, if necessary, that it must make whatever payment and settlement as honest judgment and discretion dictate, within the limits of the policy, and an abandonment of this duty to act subsequent to its assumption in part constituted bad faith'." Traders & General Ins. Co. v. Rudco Oil & Gas Co., 10 Cir., 129 F.2d 621, 627, 142 A.L.R. 799.

■ In cases of this character involving automobile insurance, the element of bad faith which is required to be established to subject the insurance company to liability must often be proved by circumstantial evidence. Southern Fire & Casualty Co. v. Norris, 35 Tenn.App. 657, 250 S.W.2d 785.

The authorities above cited, and the instructions of the trial court, hereinafter referred to, constitute the law in this case.

We turn, then, to the facts in the personal injury case brought by the Averys against Wood, the insured, and to the defense of that suit by appellant insurer, in order to ascertain if the trial court properly submitted to the jury the question whether the insurance company acted in good faith—or was guilty of bad faith—in refusing to compromise or settle the claim of Sewell Avery against Wood, before letting the case go to judgment, as a result of which Wood was subjected to payment of $10,000 more than the suit could have been settled for within the limits of the insurance policy.

It was the claim of Avery in his suit against Wood, the insured, that Wood, who had been spending the evening of May 12, 1957, with the Averys in Memphis, requested them to lead and direct him from their home to U. S. Highway 70 in order that he might, in his own car, return to his home in Crockett County, Tennessee; that just after midnight, the Averys undertook to lead Wood out of the

city of Memphis to the Highway; and that Mrs. Avery was driving her automobile with Sewell Avery, her husband, seated beside her in the right front seat. Avery had his right arm in the window with his left arm resting on top of his right arm.

On a four-lane street, the Averys proceeded on the far right-hand lane. Wood was following, driving, however, in the lane to the left of the Averys but to the right of the center line of the four-lane highway. Wood was not only to the left of the Averys, but was also, according to Mrs. Avery, to the rear of the Avery car with his front bumper being even with the rear bumper of the Avery vehicle. An oncoming car allegedly caused Wood to turn to the right. As he turned, he bumped into the Avery car and forced it off the road into an electric light pole, which smashed the Avery car and caused Avery's injuries.

In the suit brought by the Averys against Wood for his negligence, the insurance company defended on the ground that Wood acted in a sudden emergency, caused by the driver of the oncoming car crossing the center line of the highway over into the lane in which Wood was proceeding. The suit was also defended on the ground that Mrs. Avery was guilty of contributory negligence in the manner in which she drove, and that Mr. Avery was also guilty of contributory negligence in sitting with his arms resting on the open right front-hand window. In defending the suit on the plea of "sudden emergency," the insurance company claimed that it relied upon various statements taken by the insurance company from Sewell Avery, from Wood, the insured, from Mrs. Avery, and from a police officer.

The first statement of the accident secured by the insurance company was a statement by Sewell Avery, the injured man, which was taken by Jones, an insurance adjuster, on the day after the accident. At the time Jones saw Avery and secured the statement from him, Avery was in the hospital and about to enter the operating room for surgery.

He had already been administered narcotics preparatory to the operation. It is undisputed that Avery told Jones that he was in no condition to make a statement and that he requested Jones to write at the top of the statement that Avery was under the influence of narcotics—which Jones did not do. Avery did not read the statement that Jones wrote out, and cannot remember signing it. In any event, in the statement which Jones wrote out and Avery signed, it appears that Avery, at that time, stated that Wood said that he could have avoided the accident if he had slowed down and turned behind Avery "instead of speeding up"; and this is confirmed by Wood's subsequent statement that "If I had fell behind I could have made it. * * * I was trying to get in front. * * * I was picking up speed when I hit him." Jones did not contradict Avery's testimony.

Three days after the accident, Wood's first statement was secured by Theo Leathers, an adjuster for the insurance company, on May 16, 1957. Leathers wrote the statement out and Wood signed it. In the statement, Wood said that the oncoming car was "50–60 feet away when he started crossing the center line into my lane. It was dark and head lights were burning on all cars. I thought the car meeting us would pull back in his lane but he kept in my lane. I was forced to pull to my right or collide head on with the car meeting me. I pulled to my right. The right front fender and bumper collided with the left front fender and bumper of Avery's car. Mrs. Avery swayed to her right and collided head on into a light pole. The car that crowded me over didn't stop."

One week after the above statement to the insurance company, and ten days after the accident, on May 23, 1957, Wood made a statement to Mr. James Leary, one of the lawyers acting on behalf of the Averys. The statement was in the form of questions asked by Mr. Leary and answered by Wood and was taken down in shorthand by a court stenographer employed for that purpose.

In this statement, Wood said that when he saw the oncoming car it was 150 to 200 feet away. He informed Mr. Leary that he had told the insurance adjuster it was 50–60 feet away when he first saw it; but, when he afterward went down to the scene of the accident in the daylight, a few days later, he came to the conclusion that the distance in question had been 150 to 200 feet, rather than 50 feet.

In a third statement which Wood signed for the insurance company, six months after the accident, and on the morning of the trial, there was considerable information given about the accident; but, although it was prepared by the attorney for the insurance company, strangely enough, there was no mention as to how far the oncoming car was from Wood when he first saw it on the wrong side of the center line. However, the speed at which Wood was traveling was put at 25–30 miles an hour, instead of 20–25 miles an hour, as in Wood's first statement to the insurance adjuster—and, for the first time, the speed of the oncoming car was stated—as coming toward Wood at the rate of 50–70 miles an hour.

Much is made of this change in the statement of Wood that he first told the insurance company agent that the oncoming car was only 50 to 60 feet away when it crossed the center line of the highway directly into Wood's path, and his subsequent statement to the attorney for the Averys that it was 150 to 200 feet away when he first saw it crossing the line. Because of the subsequent inconsistent statement by Wood to the Averys' attorney, the insurance company seeks escape from liability on the ground that it had the right to rely on the statement made by Wood to its adjuster. But, on the trial, the attorney for the insurance company testified that such difference in the statements as to distance was of no account whatever. The attorney for the insurance company knew, before the trial, that Wood had made these statements to the Averys' lawyer, contrary to those made to the in-surance adjuster a few days before—and the insurance adjuster had been shown the subsequent statement by the attorney for the Averys; but the attorney for the insurance company testified, on the trial, with regard to the two differing statements:

"I don't believe there are any material discrepancies. * * * I have read * * * the statements he gave me * * * and the statement he gave Mr. Leary (the attorney for the Averys).

"Q. It doesn't vary? A. No.

"Q. He tried to speed up and go around; that is what [Wood] testified to at the trial? A. Part of it; he hedged on the drinking [on the part of Avery] and a few other things.

"Q. He hedged on the drinking? A. That's right.

* * * * * *

"Q. It is important in this lawsuit how far the eastbound vehicle was from Mr. Wood's car; is that right? A. I don't think it was important, if it was close enough to cause him concern and put him in an emergency.

"Q. So, therefore, the distance does become important? A. I don't know. Different distances may put different people in different frames of mind.

"Q. In the statement taken from Mrs. Avery, she said it was 200 yards away, is that correct? * * A. You have the statement. * *

"Q. You don't recall? A. You read it, and if it is in there, I will concede it."

The insurance attorney was then asked, during the course of his testimony, whether, at any place in the statement which Wood had given to him, there was any mention of how far away the oncoming car had been when it crossed the center line of the highway into Wood's path:

"Q. Is there anywhere in the statement you have there that you

took on November 13th, any place in that statement does it appear that you asked Mr. Wood here or indicated at all how far that car was away from them when it first came across the center line?

\* \* \* \* \* \*

"A. I don't see in here where he gave me a foot or yard unit."

The testimony and the statement given by Wood disclosed that he never gave the attorney for the insurance company any measurement *whatever* as to how far the oncoming car was away from him when it crossed the center line.

Appellee's counsel continued.

"Q. [As] a lawyer, you knew that was an important factor? A. I don't believe it is important. I don't believe you or your client could express an opinion as to how far any vehicle was from him meeting it at night. He was definitely under a sudden emergency.

"Q. *You knew that distance would vary from 200 yards to 50 or 60 feet?* A. *Yes;* I thought the proof as to yardage or distance would vary, but I also think that is to be expected. There would have been considerable suspicion if it didn't vary, but the reason I thought it would not vary was the fact that the car was so close he had to do what he had to do.

\* \* \* \* \* \*

"Q. All right, let me ask you, Mr. Owens, if you were not going to run out on the man [Wood] after you saw the man allegedly change his story, so far as you were concerned, did you get on the phone and call \* \* \* anyone in the Home Office to make a settlement? A. No, because even after he had varied from his original statement, he hedged and equivocated, *but he still went down the line, and he has since we have been in this trial, on the theory I was operating on, a sudden emergency.*

"Q. Then, in your opinion, he has varied his testimony substantially? A. I have told you the facts which he testified to this morning."

The plain conclusion to be drawn from the foregoing is that Wood did not, even in the opinion of the attorney for the insurance company, vary his testimony substantially from the statements he had given the representatives of the insurance company, and that there were no "material discrepancies" in Wood's various accounts of how the accident occurred.

Nevertheless, in spite of the foregoing, counsel for the insurance company, during the course of the trial of the personal injury case, told Wood, after he had testified, and while they were both returning to the attorney's office: "You ought to have told them that the car was closer than what you did \* \* \*."

After the trial of the personal injury case and the rendition of the judgments against Wood in favor of the Averys, the insurance company lawyer wrote the Claims Supervisor of the insurance company, outlining the results of the trial, and stated the following:

"Our insured's testimony was not what we hoped it would be. He would only state that the opposing vehicle's lights blinded him and appeared reluctant to estimate how close it was to him or indicate that it actually forced him into the Avery vehicle. Frankly, were it not for the other circumstances involved in this case, I would probably give our insured the benefit of the doubt and attribute his unwillingness as a witness to limited intelligence and education. However, his attitude on the stand, coupled with all of the circumstances preceding the trial of this case, certainly justifies some suspicion in the matter."

The nearest the insurance company could come to charging Wood with changing his testimony on the trial from his statements made to the insurance com-

pany before the trial, is seen in the attorney's statement that Wood "appeared reluctant to estimate how close [the approaching vehicle] was to him or indicate that it actually forced him into the Avery vehicle," but the attorney had already testified on the trial that there was no "material discrepancy" between Wood's testimony and his prior statements; that it was not important how far the oncoming car was from Wood when it crossed the center line; and, in effect, that no one could express an opinion "as to how far any vehicle was from him meeting it at night."

What were the circumstances that justified "some suspicion" as to Wood's testimony or cooperation? There were no circumstances justifying any reasonable suspicion. It amounted to nothing more than imagination. As soon as the insurance company heard of the accident, it started to "suspect" Wood. The insurance adjuster who first investigated the accident commenced his questions to Wood:

"You mean you were driving along by the side of a good-looking woman and wasn't talking to her?"

To which Wood replied: "No, I was watching my driving."

After the above episode, the Claims Supervisor wrote Adjuster Allen Jones:

"For some reason I am inclined to believe there might be more than a casual acquaintance between the insured and Mrs. Avery, that they were riding along courting *and that actually our insured was not forced into her car by an oncoming car.*" (Emphasis supplied.)

Later, the Claims Supervisor wrote Adjuster Allen:

"I agree there seems to be more than a casual relationship between our insured and the claimants. It would be expected that our insured would have followed Mrs. Avery as she was leading him out of town as they contended they were doing. It would be an awkward way of directing a person through town especially since the person being directed would have no way of knowing when and in what direction the directing party was going until the maneuver was completed.

"There is a possibility of the claimants not being willing to go to Court to press their claim if there was some unusual relationship between Mrs. Avery and our insured. If this were the case I assume Mrs. Avery would hesitate to get in the position of being cross-examined in Court.

"I am sure both of you will continue to follow any leads that come to your attention about the relationship between our insured and the claimants."

On cross-examination, the attorney for the insurance company was asked:

"Q. Mr. Owens, in your file was some indication your company thought there was a love affair, or at least a flirtation, going on between Mr. Wood and Mrs. Avery. A. I will say this, based on the file, the boy was suspicious.

"Q. What fact * * * in that trial tells you there was a flirtation or any kind of romance going on between Mr. Wood and Mrs. Avery? A. Tell me, you said the boys in the Home Office.

"Q. Will you tell me what facts in the file——(interrupted). A. You have them."

There were no facts in the file, or in the evidence, to show any romance or flirtation between Wood and Mrs. Avery. This was just imagination.

Although there was no evidence of such a flirtation or romance between Wood and Mrs. Avery, the insurance company seemed to be obsessed about the idea and thought that as a result of such a romance, Wood was driving his car beside the car of Mrs. Avery and flirting with her, and that such conduct caused the accident. There was no evidence to warrant such a view. But the strange thing in this regard is that if such had

been the case, Wood would clearly have been guilty of negligence, and the insurance company would, without question, have been liable for the loss resulting from the collision. In attempting to rely upon a flirtation between Wood and Mrs. Avery, the company was really doing everything possible to subject itself to liability—yet this point seemed to be overlooked at the time.

Although appellant insurance company now claims that Wood was guilty of collusion with the Averys and did not cooperate with it in the defense of the case, that claim was denied by the attorney for the insurance company during the trial of the case before the jury. On cross-examination, the attorney for the insurance company was asked:

"Q. So this man [Wood] who was colluding with the Averys——
A. You said that.

"Q. Well, that is your defense in this lawsuit, colluding with the Averys to get money out of the insurance company. Mr. Wood made a statement important to your defense, a much more important statement on November 13th than he did on May 16th, yet he is not cooperating with the company? A. I don't say that."

At another point, the attorney for the insurance company, on cross-examination, testified:

"Q. If Mr. Wood was not cooperating with the company or stretching the truth, or telling a falsehood, then he told a pretty good story to set up a sudden emergency, did he not? A. Can't fight over that."

And later the attorney for the insurance company testified:

"* * * even after [Wood] had varied from his original statement, he hedged and equivocated, but he still went down the line, and he has since we have been in this trial, on the theory I was operating on, a sudden emergency."

There seems no way of interpreting the above testimony of the attorney for the insurance company, except as a withdrawal of the claim—at least, before the jury—that Wood was not cooperating with the insurance company, and an admission that he was thoroughly cooperating with the company on their defense of "sudden emergency." Yet the claim of Wood's non-cooperation is advanced again on this appeal.

In determining whether a variance between statements made to the insurer and subsequent statements or testimony constitutes a failure to cooperate with the insurer, consideration should be given to the extent of such variation or discrepancy, since a mere discrepancy in minor detail or an honest mistake between the several statements of the facts surrounding the accident is not sufficient to avoid the policy. Ocean Accident & Guarantee Corp. v. Lucas, 6 Cir., 74 F.2d 115, 98 A.L.R. 1461.

"If lack of cooperation under such a policy is found to exist upon the sole ground of variance in statements, that variance must be not only material, but conscious. Otherwise, an unscrupulous claim adjuster taking a written statement prior to trial could derive great advantage from such variance, for the honest witness might unconsciously vary a repeated story." Ocean Accident & Guarantee Corp. v. Lucas, 6 Cir., 74 F.2d 115, 117, 98 A.L.R. 1461.

Appellant insurance company attaches much importance to the statement taken by Insurance Adjuster Allen Jones, and signed by Mrs. Avery, a few days after the accident, in which she purports to say: "I seen this car meeting us about 200 yards away, driving east pull across the center line and was meeting Therion [Wood] head-on * * *. Therion did not have any place to go to keep from getting hit; * * * but Therion could not help hitting us."

The foregoing statement would, almost in itself, prove appellant's contention here, and require a reversal of the judgment, except for one circumstance: Mrs.

Avery denies she ever told the insurance company adjuster, Allen Jones, anything of the kind. She testified that he came to see her a few days after the accident just as she was leaving her home for the hospital to be with her husband; that she told him that the oncoming car was about half a city block away when it crossed the center line. She denied that she told Jones that "Therion did not have any place to go," or "that the accident was unavoidable," or "that Therion had to turn his car to the right, that he had nowhere else to go."

In the light of Mrs. Avery's denials that she told Allen Jones any of these things upon which the insurance company now relies, one naturally looks for some contradictory testimony from Mr. Jones. But no one contradicted Mrs. Avery's testimony. Although Adjuster Jones was present in the courtroom during the entire trial, he never took the stand as a witness. Moreover, Mrs. Avery stated that Jones, himself, wrote out the statement; that she signed it without reading it, because Jones told her that he needed the statement *so that he could settle the claim*. This testimony of Mrs. Avery is also undisputed. She further testified that the approaching car had only crossed the center line momentarily; that the lights did not blind her; that the oncoming car had passed before the wreck occurred; that, in her opinion, it was not speeding; and that Wood came from behind and cut into the front of her car forcing her into the telephone pole.

In the light of Mrs. Avery's undisputed testimony, the statement prepared by Adjuster Jones and introduced in the case by the insurance company, is of no evidential value whatever.

The crucial facts with regard to the accident are the following: Wood, although being directed and "led" out of the city of Memphis toward U. S. Highway 70 by the Avery car with Mrs. Avery driving—was not following her. He was driving to the left of the Avery car. It is worthy of note that when the Claims Supervisor of the insurance company first learned of this fact, he wrote the insurance investigator of the company that he believed "that actually our insured was not forced into her car by an oncoming car"; and that it would be expected that Wood would *follow* Mrs. Avery, and that it was an awkward way of directing a person through the town when he would have no way of knowing where the directing party was going until "the maneuver was completed." But, not only was Wood to the left of the Avery car but his front bumper was either even with the rear bumper of the Avery car or even with the middle of it. The Avery car was going 25 miles an hour; the Wood car, at the same speed. Wood was a young man, 22 years old. He was an automobile racer. He participated in automobile, or "drag races." His car was mechanically adjusted for great speed, or, as the saying is, "souped up." While he was driving by the side and to the rear of the Avery car, he suddenly speeded his car up and turned to the right to get ahead of the Avery car. Wood had got from the rear of the Avery car to the front of it when he cut in ahead, but instead of getting over ahead of it, his front right bumper crashed into the front left bumper of the Averys, driving it into the telephone pole. All of this is undisputed. Wood testified that if he had had another second, he could have made it. Although Wood said he was blinded by the lights of the oncoming car and tried to get out of its path, actually, he did not succeed in getting out of its path, *yet the oncoming car passed without touching him*. It must, therefore, have barely crossed the center line, or have crossed it so far away from Wood that it was able to get back into its proper lane at a considerable distance away as it advanced toward him, and as he advanced toward it. Wood, however, stuck to his story, upon which the insurance company relied—that the lights of the oncoming car blinded him; and the insurance company, because of this statement, which he never changed, went to trial on the issue of sudden emergency.

However, as Wood stated to Mr. Leary, the attorney for the Averys:

"I waited until [the oncoming car] got closer to see what he was going to do. If I had fell behind I could have made it."

This statement was shown to the insurance company shortly after Wood made it, and the company also knew that at that time Wood was confused about the distance at which he had seen the oncoming car approaching and that he had finally stated that he did not know how far it was away. This statement would indicate that Wood was not blinded by the lights of the oncoming car, as he continued to watch it to see what it was going to do. Adjuster Jones wrote the company that he had seen the statement which Wood made to Mr. Leary and that, according to the statement, Wood was somewhat confused and finally stated he did not know how far the oncoming car was away, "when he pulled into the Avery vehicle."

In the answers which Wood gave to Averys' lawyer, it was stated:

"Q. At the time your car and Mr. Avery's car actually collided; in other words, came together, how far away at that time was that other car; that is, the car that was coming towards you? A. I would be afraid to say because, to be honest, I just don't know. I was just trying to get out of there.

"Q. This all happened pretty quick there and you saw him 150 to 200 feet away and at that time you cut in? A. I was trying to get in front; I would be afraid to say.

"Q. You think if you had got behind, you would have avoided the accident? A. Yes.

"Q. At that time, where was the front of your car, even with the front of the Avery car? A. When I saw the other car?

"Q. Yes. A. I would be afraid to say, but it seemed to me like I was a little behind. I was picking up speed when I hit him."

The foregoing certainly does not, in itself, bear any marks of collusion. The insurance company saw this statement long before the trial, and it does not appear that, at that time, it claimed it was collusive.

The question whether the insurance company believed the case should have been settled or not, bears upon its good faith. Mrs. Avery's testimony is undisputed that the adjuster told her that he needed her statement "so that he could settle the claims." The Claims Supervisor also wrote the adjuster that Averys' attorney realized "that you will want to settle both claims at the same time, and I would now press him for his demands for Mrs. Avery. * * * I am inclined to believe that we should get the demands of Attorney Molloy for both of his clients before we make an offer for Mr. Avery." At that time, therefore, it appears that the insurance company was planning to make an offer of settlement. Furthermore, it continually asked Averys' attorney for additional medical reports of Avery's injuries, and a list of "special damages," which were furnished. But no offer of settlement was ever made thereafter by the insurance company, and it rejected Avery's offer for a settlement within the policy limits.

Was this reversal on the part of the insurance company to make an offer of settlement based upon its belief that it had a good defense to the suit for negligence and the claim for damages? The company admitted before the trial of the personal injury case that it had concluded that the damages would probably exceed the policy limits. Did it contest the case because it felt the insured was free from negligence? Or did it gamble with Wood's money in the hope of escaping the full liability imposed upon it by the policy?

When Avery's attorney requested that the insurance company settle his claim for a sum a little less than the policy limits, the adjuster for the insurance company replied that Avery's attorney was not giving him "any incentive to settle" and that the insurance company

"might as well take their chances, that they hadn't a thing in the world to lose, where [they] had to pay out the entire policy to settle it," and "if we are going to have to pay that much, might as well take our chance."

In Tennessee Farmers Mutual Insurance Company v. Hammond, Tenn.App., 306 S.W.2d 13, 21, where the facts disclosed that, among other circumstances, an insurer had stated to its insured: "There is no reason for us to settle this case with you, you are demanding the policy limits; we have nothing to lose by trying it"; and that, when, on another occasion, the insured asked his insurer, "Why don't you settle these cases?", and the insurer replied, "We can't lose; you are asking all the coverage," the Tennessee Court of Appeals held that "the evidence in this record is amply sufficient to have justified the jury in finding as a fact that Tennessee Farmers Mutual Insurance Company subordinated the rights of its insured to its own interests, and that this amounted to lack of good faith on the part of the insurance company."

One of the strange circumstances in the case indicates why the insurance company may not have been interested in making any offer of settlement. Its representative, in talking to Wood, found that he was a poor man who owned no property except a horse and who earned only $55.00 a week. The insurance company representative testified that he would have been more concerned about a verdict in excess of the policy limits, if Wood had been solvent; and that he looked upon a poor man differently than upon a rich one.

Instead of making a reasonable offer of settlement of Avery's claim, the insurance company never made any offer whatever.

█ In the light of the foregoing, was there, in the instant case, an issue of fact presented for determination of the jury, whether the insurance company was defending the case because it believed there was a fair and reasonable prospect of escaping liability under the policy, or getting off for less than the policy limits—or was it gambling with the insured's rights, merely because the offer of settlement was not sufficiently less than the policy limits, and so was no inducement for it to settle? In order to resolve this question, the following circumstances are pertinent: The insurance company knew, from the first statement it secured after the accident, that Avery told the adjuster that Wood had said he could have avoided the wreck "by backing up instead of speeding up." Before the trial, the company knew that Wood had been driving to the left of the Avery car and behind it, and that he had suddenly speeded up to pass it and turned in front of it; that his right front bumper had struck the left front bumper of the Avery car crashing it into a telephone pole, and the company knew that Wood had said he could have avoided the accident "by dropping back." As far as the oncoming car's causing Wood to act in a "sudden emergency," everything in the letters exchanged between the adjuster, the Claims Supervisor, and the attorney for the insurance company indicates that they were very doubtful of this being the cause of the accident, and that the only way they could figure out how it happened was that Wood was driving along by the side of the Avery car carrying on a conversation with Mrs. Avery and flirting with her. This would have made the insurance company clearly liable; but these representatives of the company could not avoid the conclusion, in their own minds, that Wood had been negligent in some way; and none of them seemed to have really believed that the accident was caused by Wood's being blinded by the lights of an oncoming car, and, as a result, being forced to act in a sudden emergency—although Wood, as the attorney for the insurance company testified, "went down the line" for him on the theory of a sudden emergency. There seems to be no explanation of the doubt, anxiety, and suspicion on the part of the insurance company representatives concerning the relation-

ship between Wood and Mrs. Avery except that they believed that Wood was really guilty of negligence. Moreover, Wood was guilty of negligence if he did not slacken the speed of his car instead of increasing his speed and trying to pass over in front of the Avery car, when, as he says, he was blinded by the lights of an approaching car. Ruth v. Vroom, 245 Mich. 88, 222 N.W. 155, 62 A.L.R. 1528.

It appears also that the adjuster for the insurance company told Mrs. Avery he appreciated her signing the statement so that he could settle the claim; and the Claims Supervisor proceeded, at first, on the basis of settling the claim.

When the insurance company found that the actual damages were greatly in excess of the policy limits, it refused settlement on the ground that there was no incentive to settle and that the company might as well take its chances as it "hadn't a thing in the world to lose."

▪ As the trial court properly charged the jury: " * * * 'bad faith' on the part of an insurance company in this type of case implies 'the idea of willingness to gamble with the insured's money, or an intentional disregard of the financial interests of its insured, in the hope of escaping full liability imposed upon it by its contract of insurance.' * * * 'good faith' required the insurance company in this case to investigate the Avery claim to such an extent that it would be in position to exercise an honest judgment as to its merits and whether the claim should be settled."

The court further charged the jury:

"[In] order to honestly discharge its duty to settle or compromise within the policy limits, an insurer must exercise ordinary care and diligence; that is, such care and diligence as would be exercised by the ordinarily prudent person in the same circumstances, among other things, in the investigation of the case and the extent of the injury and damage for which the insured may be held liable. The manner in which the insurer investigates a case, negotiates to settle, or prepares for trial, has an important bearing on the question of 'bad faith' in refusing or failing to settle a claim made against its insureds. In this connection, the Court instructs you that circumstantial evidence from which the existence of main facts may be deduced, as distinguished from direct and positive evidence or proof may be used to establish bad faith and that negligence in investigation, as the Court has already instructed you, is suggestive of indifference to the trust imposed by the policy and which, in turn, may raise an inference of 'bad faith.'

" * * * The insured surrenders to the insurer the right to investigate and compromise or contest claims knowing that, in the event of claim, the insurer will have its own interests to consider, but an insured also has a right to assume that his interests will not be abandoned merely because the insurer faces the prospect of a full loss under the policy. The relation is one of trust calling for reciprocity of action. The insured, you understand, under his policy owes the duty of full cooperation—the insurer the duty of exercising good faith and diligence in protecting the interests of its insured.

" * * * [A] liability insurance carrier has the right and privilege under its policy, you understand, to elect to contend that its insured was free from negligence and in no wise liable, but it must assert such right in good faith and upon its honest belief and an arbitrary and capricious denial of payment of settlement may amount to bad faith."

If the insurance company, then, was guilty of an intentional disregard of Wood's interests, in hoping to escape full liability under the policy, it was guilty of bad faith; if it did not exercise an honest judgment as to the merits of the case, and whether it should be settled, it

was guilty of bad faith; if the circumstances suggested to the jury that the insurance company was indifferent to the trust imposed by the policy to guard Wood's rights equally with its own, the jury might find bad faith; if the insurance company abandoned Wood's interests merely because it faced the prospect of a full loss under the policy, it was guilty of bad faith; if the insurance company was guilty of arbitrary and capricious denial of settlement within the policy limits, its action might have been found to amount to bad faith.

Since the claim against the insured exceeded the policy limits, a conflict of interests arose between the insurer, as agent, and the insured, as principal; and the insurance company's conduct in such a case is subject to closer scrutiny than that of the ordinary agent, because of its adverse interests. As stated by appellant insurance company, the applicable rule of law in this case is as follows:

 "If the proof, in the light of all the relevant circumstances, and inferences to be drawn therefrom is such as to leave a reasonable basis for disagreement among reasonable minds, the question of good faith of the insurer in the handling of the claim and conducting compromise negotiations is for the jury."

 In view of the foregoing, and in the light of all the relevant circumstances and inferences to be drawn therefrom, it appears that the evidence in this case is such as to leave a reasonable basis for disagreement among reasonable minds as to the good faith of the insurance company in the handling of the claim, and, accordingly, the question of the insurance company's good faith was for the jury.

In an effort to show that it acted in good faith in refusing to make an offer of settlement, and also that Wood failed to cooperate with it in the defense of the suit, the insurance company points to evidence which, it contends, shows Avery, the injured man, to have been intoxicated at the time of the accident, and Wood's contradictory statements as to such intoxication. How this could possibly be relevant to Wood's negligence, or to the claimed contributory negligence of Avery, is impossible to appreciate. Avery was not driving the car; Mrs. Avery was driving and in full control. Yet, it is maintained that Avery, because of his intoxication, was seated by her side, facing to the right, with his right elbow resting on the open sill of the right-hand window, and his left arm resting along the sill. This, says the insurance company, was contributory negligence on his part since, as the attorney for the insurance company testified, "the way he was sitting"—with his right elbow and his left arm resting on the ledge—"broke his arm and was the direct and proximate cause of his injury," when the Avery car was struck by Wood and crashed into the telephone pole. This is such a far cry from contributory negligence or proximate cause of the injuries resulting from the crash, that it cannot be taken seriously as a defense. It is, however, to be noted that Avery and Mrs. Avery deny that he was intoxicated; that Lt. McCrary, who was the first police officer arriving at the scene and who squatted down on the pavement to talk to Avery as he was lying on his back, testified that he detected no odor of liquor or signs of intoxication, although he thought that if Avery had been intoxicated, he would have detected it. Another officer, Mr. Owen, of the Police Department, came on the scene later and was present when Lt. McCrary was talking to Avery. Owen testified that he afterward did detect the odor of liquor on Avery's breath. Owen also said that as Avery lay on the ground suffering from the arm, "broken completely in two," he thought from "the manner of his speech and the general overall appearance of Mr. Avery," under his flashlight, he was intoxicated or "high"—although, as Owen said, "his arm apparently was broken and he was in considerable pain." This latter statement would seem to require some further investigation as to Avery's intoxication, if that question

**36**

was relevant; but no representative of the insurance company ever asked either Mr. Avery or his wife whether he had been intoxicated; it never ascertained that Lt. McCrary had been present at the scene; and it never asked any of the nurses or hospital attendants whether, in their opinion, Avery had been intoxicated, when he arrived at the hospital.

Wood had signed a statement prepared by the insurance adjuster in which it was set forth that Avery had been drinking before the accident. Several months later, just before the trial, in the statement which was prepared for Wood, which he signed, it was stated that Avery "got pretty well drunk. * * * Mrs. Avery was driving because Avery was drunk." On the trial, Wood testified that Avery had been drinking something that looked like whiskey; that he didn't actually know it was whiskey, but that it was probably whiskey or beer and that Avery acted "tight." The first statement which Wood signed set forth that Avery had two or three shots of whiskey between 8:00 P. M. and midnight before the accident. On the trial, he testified that after 7:30 P. M., he did not see Avery drink anything more, but that when Wood left Avery's home to be directed out of the city by Mrs. Avery, "Avery acted like he was kinda tight." The insurance company contends that Wood thus changed his testimony from his prior statement to the company, and tried to carry water on both shoulders; but there was no substantial variation in Wood's statement as to Avery's intoxication. In any event, Avery's intoxication was not material on the question of the liability of the insurance company.

Like Avery's claimed contributory negligence based on his sitting with his arms on the ledge of the window of the car, Mrs. Avery's claimed contributory negligence disappeared completely during the trial of the case. It was never mentioned after it was pleaded; and it was pleaded because of the assumption on the part of the insurance company that if Wood was guilty of negligence for not having avoided the collision, then Mrs. Avery was also guilty of contributory negligence for not having avoided it—a complete non-sequitur and so recognized by the insurance company afterward. But it was a plea that also assumed Wood's negligence—which was the basis of the Avery suit.

As to the question of Wood's cooperation with the insurance company after the accident and during the trial of the personal injury case, most of appellant's contentions have already been disposed of in the foregoing discussion. As admitted on the trial by the attorney for the insurance company, the differences between Wood's statements to the insurance company and his testimony on the trial were mere discrepancies that were not material. Wood "went down the line" for the company on the theory of its defense—sudden emergency.

It is said that Wood was cautioned by the insurance company against giving any statements regarding the accident and that, notwithstanding this, he later voluntarily gave a statement to Avery's attorney. However, on the trial, this was not considered by the attorney for the insurance company as collusion with the Averys or non-cooperation with the company. As the attorney for the company testified, the investigation which was made by Avery's attorney was proper; that if he had been Avery's attorney, he would have done the same thing; that there was no policy provision which restrained Wood from talking to anybody, including the parties on the other side.

From the foregoing, we fail to find any ground for the conclusion that Wood was guilty of collusion or non-cooperation. As a matter of fact, Wood did not know he was giving a statement to Avery's lawyer. The latter went to the place where Wood was working and the attorney's questions and Wood's answers were taken down in shorthand by a court stenographer. Wood did not notice her; he did not think he was making a statement; and he did not sign the statement.

Subsequent to the conclusion of the personal injury trial and the rendition of the judgments, the lawyer for the insurance company, in writing to the Claims Supervisor, after saying that Wood's testimony was not what he hoped it would be, stated he would give Wood the benefit of the doubt and attribute his unwillingness as a witness to limited intelligence and education, except for his attitude on the stand and all of the circumstances preceding the case, which justified some suspicion. We find nothing pointed out as to Wood's attitude on the stand or any circumstances preceding the case which would detract from giving Wood the benefit of the doubt of his cooperation, and nothing to justify any suspicion of collusion. Wood was a friend of the Averys; but it is a well-known rule that a lack of good faith is not to be inferred merely from relationship between the insured and the person injured, and the fact that the insured had an inherent sympathy with those injured by his negligent operation of an automobile is not controlling on the issue whether the insured failed to cooperate with the insurer. To constitute a breach of a cooperation clause by the insured, there must be a lack of cooperation in some substantial and material respect, a technical or inconsequential lack of cooperation or a misstatement to the insurer being immaterial in such respect. State Farm Mutual Automobile Ins. Co. v. Palmer, 9 Cir., 237 F.2d 887, 60 A.L.R. 2d 1138.

The failure of the insured to meet the requirements imposed by the cooperation clause constitutes an affirmative defense which must be pleaded by the insurer and the burden is upon the insurer to prove such noncompliance and that prejudice to the insurer resulted therefrom. State Farm Mutual Automobile Ins. Co. v. Koval, 10 Cir., 146 F. 2d 118, 120.

Whether an insured under an automobile indemnity policy has failed to cooperate with the insurer in the defense of suits against it, as required by the policy, and whether such failure to cooperate has operated to the substantial prejudice of the insurer in the particular case, are questions for the jury. American Fire & Casualty Co. v. Vliet, 148 Fla. 568, 4 So.2d 862, 139 A.L.R. 767. The question whether Wood had cooperated was, viewing the case in the most favorable light for the insurance company, a question of fact for the jury.

In any event, the claim that Wood might have breached the insurance contract was waived by the insurance company. In spite of its present contention that the company is discharged from its obligation by reason of Wood's conduct, it actually paid—after the entry of the judgments—the entire amount of its liability under the policy into court. If an automobile liability insurer assumes and conducts the defense of an action brought against the insured, with knowledge of facts taking the accident or injury outside the coverage of the policy, without disclaiming liability or giving notice of a reservation of its right to deny coverage, such insurer is thereafter precluded in an action upon the policy from setting up the defense of noncoverage. Schmidt v. National Automobile & Casualty Ins. Co., 8 Cir., 207 F.2d 301.

In the instant case, it seems obvious that the insurance company finally considered it was liable under the terms of the policy, as, otherwise, no reason appears why it should have paid the policy limits, after the trial and the entry of the judgments in the personal injury case brought by the Averys against Wood, the insured.

Where an insurer, with knowledge of the breach of a condition, pays the amount of a loss into court on an interpleader, or pays, or partially pays, any loss under the policy, it recognizes the policy as still in existence and must be considered to have waived its defense of a claimed breach.

The insurance company's payment of the entire amount of its liability under the policy waived any breach of condi-

tion by Wood; and the insurance company cannot now be heard to contend that it is not liable to Wood because of his failure to cooperate with the company. But it is not necessary in this case for Wood to rely upon a waiver of any breach. The evidence of the insurance company's own witnesses is sufficient to show that Wood was not guilty of collusion and that he did not fail to cooperate; and that question was properly submitted to the jury as a question of fact.

This case was tried before an experienced trial judge, and was submitted in careful and comprehensive instructions to the jury. The only issue presented on appeal is whether the trial judge committed reversible error in submitting the question of the insurance company's good faith and the question of the insurer's cooperation to the jury for their determination as questions of fact.

I am of the opinion that the substantial evidence from which the good faith of the insurer and the cooperation of the insured might be deduced presented questions of fact properly determinable by the jury.

In accordance with the foregoing, the judgment of the District Court is affirmed.

WEICK, Circuit Judge (dissenting).

I regret that I cannot agree with the conclusion reached by the majority. To my thinking, the most important factor in this case is what information concerning the accident in question appellant was possessed of in determining if a settlement should be made. The degree of variance between the statements which it had and the actual testimony at the trial of the injury actions, which the majority has considered to be of primary importance, I consider to be secondary.

In this Court, the only error assigned by the insurance company is that the District Court erred in not directing a verdict in its favor. The question whether the insurance company exercised bad faith in the handling of the claims and conducting the settlement negotiations was for the jury to decide only "if the proof, in the light of all the relevant circumstances, and inferences to be drawn, is such as to leave a reasonable basis for disagreement among reasonable minds." Southern Fire & Casualty Co. v. Norris, 1952, 35 Tenn.App. 657, 670, 671, 250 S.W.2d 785, 791.

Prior to the accident Wood lived in Alamo, Tennessee. He was acquainted with Sewell Avery's brothers Frank and James Avery and in November, 1957 he was in partnership with them in a garage business. A week or two prior to the accident Wood talked with Sewell Avery about getting a job in Memphis, and as a result of that conversation drove there on May 10, 1957 in his 1953 Ford automobile (which was "souped up" for drag racing). Wood stayed at the Avery home in Memphis while he was in that city. During his stay he was offered a job by a man who employed Mrs. Avery, and accompanied Mr. Avery and his wife's employer to the stock car races on Saturday night. He departed for his home in Alamo in his automobile sometime after midnight Sunday. Mrs. Avery drove her car, accompanied by Mr. Avery, to direct Wood through the city to Route 70, as Wood was not acquainted with the streets in Memphis.

They were proceeding west on Park Avenue, a four lane highway, in Memphis. The Avery car was in the curb lane. Wood occupied the lane next to the center line of the road and was along side of the Avery car. Both cars were being operated at about 20 to 30 miles per hour. Suddenly Wood cut his car to the right and collided with the left front side of the Avery car, which crashed into a light pole on the side of the road.

Police Officers Owen and Crawford arrived at the scene of the accident shortly thereafter. The police report, prepared by Officer Owen, recites:

"Vehicle No. 2 [Avery car] west on Park in curb lane, No. 1 [Wood car] west in the center lane. Vehicle X—according to drivers in Vehicles 1 and 2 also passenger in No.

2, was east on Park and came across center line to wrong side of street heading head on at No. 1. Vehicle No. 1 hit brakes and was forced to pull to his right to avoid X vehicle, and in doing so his right side struck the left side of Vehicle No. 2. No. 2 was forced to the right and went up a private drive and with the front of Vehicle No. 2 struck a telephone pole."

The first account of the accident given by Therion Wood to anyone connected with this litigation was on May 16, 1957. At that time Theo Leathers, an adjuster for appellant, took a statement from Wood, in which he stated:

"We were driving north on East Parkway [1] at 20–25 miles per hour. Mr. and Mrs. Avery were even with me in the right lane. We were meeting only one southbound car. It was in the lane next to the center line. He was 50–60 feet away when he started crossing the center line into my lane. It was dark and head lights were burning on all cars. I thought the car meeting us would pull back in his lane but he kept in my lane. I was forced to pull to my right or collide head on with the car meeting me.

\* \* \* \* \* \*

"I think the accident was caused by the car crossing the center line and forcing me over. There wasn't anything I could do. If I hadn't swerved I would have struck the car headon."

On November 13, 1957 Mr. Don G. Owens, attorney for the insurance company who defended Wood in the Avery suits, took a statement from him. The statement was re-read and signed by Wood on February 12, 1958, the day the trial of the Avery cases in the Circuit Court of Tennessee commenced. That statement recites:

"We met a car going the other way which came over on my side suddenly and blinded me. I had to pull to my right to keep from being hit head-on by the car meeting us. \* \* \* After I turned to my right suddenly to miss the other car and hit the Avery car, I pulled away from it and there was room for Mrs. Avery to straighten out her car and miss the post. When the car we were meeting pulled over in front of me we were going 25 to 30 miles per hour. The car meeting us was going from 50 to 70 miles per hour. \* \* \* The accident was not my fault and Mrs. Avery and Vinson Avery and myself told the police it was not. I was not given a ticket."

On May 17, 1957 Mrs. Avery gave a statement to an insurance company representative. In it she said that "I seen this car meeting us about 200 yards away, driving east pull across the center line and was meeting Therion head-on", and "Therion did not have any place to go to keep from getting hit", "but Therion could not help hitting us."

A statement was taken by the insurance company from Sewell Avery on May 14, 1957. In it he stated:

"I saw a car meeting us and was over the center line of the street meeting the car that was to my left [Wood's car] headon. Instead of the car to my left slowing up and trying to get in behind my car, he tried to pull in front of my car and pulled into the right front fender of my car. \* \* \*

"P. S. The Wood's boy stated that he could have avoided the wreck by backing up instead of speeding up."

The question of Sewell Avery's sobriety on the night of the accident was considered to be of importance by attorney Owens. He felt that if Mr. Avery was intoxicated at the time of the accident he might be considered contributorily negligent. This was predicated on a theory that Mr. Avery's injuries resulted

1. He later corrected this, stating he was in error in saying East Parkway, as the accident in fact did occur on Park Ave.

from his being seated with his head and left arm in the window on the passenger's side of the car; that he was seated in that abnormal manner because he was drunk; that his drunkenness was contributory negligence.

In this regard, in his statement of May 16, 1957 Wood said "Vinson had been drinking." He amplified on this in his statement to attorney Owens, wherein he claimed:

"Vinson Avery and his wife's boss were drinking and Vinson got pretty well drunk. After Mrs. Avery's boss left, the Averys and I sat around until about midnight and Vinson had two or three more shots of whiskey * * * Mrs. Avery was driving because Avery was drunk. He was sitting with his head in the window because he was probably sick. * * *"

The police report contained no mention of Mr. Avery having been intoxicated. However, in investigating the accident attorney Owens was told by Officer Owen that Avery was in fact intoxicated.

Wood was cautioned by the insurance company against giving any statements regarding the accident. Notwithstanding this, on May 23, 1957 Wood was visited by Mr. Avery and his attorney, accompanied by a stenographer, and voluntarily gave a statement. He said that he first saw the oncoming car 150–200 feet away, but delayed his actions until it got closer to him in order to see what he was going to do. In answer to various questions he stated:

"I pulled over and I tried to come ahead and I didn't make it."

"If I had fell behind I could have made it."

"If I had given it a second, I might have made it."

His final words on the accident were as follows:

"Q. You think if you had got behind, you would have avoided the accident? A. Yes.

"Q. At that time, where was the front of your car, even with the front of the Avery car? A. When I saw the other car.

"Q. Yes. A. I would be afraid to say, but it seemed to me like I was a little behind. I was picking up speed when I hit him."

The insurance company was aware of the existence, and content, of this statement at the time the cases against Wood went to trial.

At the trial of the injury cases in the Circuit Court of Tennessee, Therion Omer Wood was called upon to testify in his own behalf. The sum and substance of his testimony in that case can be derived from his testimony in the present action.

"Q. Now, when you testified in the Circuit Court, you told the jury down there you could have avoided the accident either by pulling up or by dropping back, didn't you? A. I said by dropping back I could have avoided it."

On the matter of Sewell Avery's intoxication, Wood partially retreated from the assertions he made to the insurance company. He testified that he did not know whether Avery was drinking whiskey or beer, and that he didn't see Avery drinking anything after 7:30 p. m. The general import of his entire questioning on the matter of Sewell Avery's intoxication is reflected in the following question and answer given during this trial.

"Q. Now, you also told them [the jury], did you not, that you did not know whether Avery was drunk or not, didn't you? A. I said it then, didn't know whether Avery was drunk or not."

To this picture of the facts in the possession of the parties prior to the trial of the injury claims, and the actual testimony at the trial, the Tennessee law on bad faith is to be applied.

The following general propositions are derived from a synthesis of the Tennessee decisions on this question.

An insurer is not required, at its peril, to settle any and all claims which may be asserted against its insured irrespec-

tive of their merit. It may choose to litigate the claims and to contend that its insured was not negligent and in no way liable therefor. In exercising such right, it must do so in good faith and upon its honest belief that there is no liability. Stated conversely, bad faith implies the idea of a willingness to gamble with the insured's money, or an intentional disregard of the financial interest of its insured, and in the mere hope of escaping full liability.

Good faith also requires the insurer to investigate a claim to such an extent that it would be in a position to exercise an honest judgment as to its merits and determine whether or not it should be settled. The vital question is not what the actual facts were, but what facts were known to the insurer, as a result of such an investigation, which it should have taken into account in determining whether or not a settlement should be made.

If the insurer dealt fairly with the insured and acted honestly and according to its best judgment it would not be liable. Errors or mistakes of judgment do not constitute bad faith. The insured likewise has a correlative duty to the insurer to exercise good faith and to act fairly towards it.

While the insurer may consider and protect its own interest it has no right to sacrifice or abandon the interest of its insured. But the insurer is under no duty to settle within the policy limits simply because such a settlement could be made if to continue to resist or fight offers a fair and reasonable prospect of escaping liability under its policy or of getting off for less than the policy limit.

The only decision of the Tennessee Supreme Court cited by either side is Aycock Hosiery Mills v. Maryland Casualty Co., 1928, 157 Tenn. 559, 11 S.W.2d 889, 892. It arose from an extremely tangled web of facts concerning a claim for Workmen's Compensation. In that case the court said:

"An insurer assuming under its policy to control litigation against the insured must act in good faith and with reasonable diligence and caution. Douglas v. [United States] F. & G. Co., 81 N.H. 371, 127 A. 708, 37 A.L.R. 1477. That obligation attended the contract, and liability for breach of the obligation arises out of the injurious conduct of the insurer who assumed to act under the contract."

Two decisions of the Tennessee Court of Appeals and three decisions of federal courts applying Tennessee law have been cited on the specific problem involved in the present case. There is one prevailing thread running throughout. In each the insured's liability for the personal injuries was so clear as to raise no reasonable probability of his escaping liability.

In Tennessee Farmers Mutual Ins. Co. v. Hammond, Tenn.App., 1957, 306 S.W. 2d 13, the insured's automobile ran up the steps of a building injuring persons ascending the steps. The majority opinion therein was based on the premise that the insured's liability was clear cut, on either of two allegations of negligence. On this basis it was held that the case was properly submitted to the jury on the issue of bad faith. A lengthy dissent was entered though, on the theory that the insured's liability had not been free from doubt. To the dissenter a serious question of the obviousness of the insured's inescapable negligence existed at the time the injury actions were tried. This being true, he said, no Tennessee authority warranted submission of the bad faith case to the jury.

A similar division of opinion existed in Southern Fire and Casualty Co. v. Norris, 1952, 35 Tenn.App. 657, 250 S.W. 2d 785. The majority found that the insurance company had before it evidence that the plaintiff in the injury action could show a condition of permanent disability, and that a great preponderance of the evidence would show a case of liability. The injured person had several eye-witnesses to the accident whose testimony corroborated his version, while the defendant had only a

rather far-fetched story to tell in the hope of avoiding liability. On facts as strong as those one judge dissented, on the theory that the insured's liability was still not so clearly established as to stigmatize the actions of the insurance company in failing to settle as being done in bad faith.

The decisions of the federal courts before-mentioned on this question are Noshey v. American Auto Insurance Co., 6 Cir., 1934, 68 F.2d 808; Vanderbilt University v. Hartford Accident & Indemnity Co., D.C.Tenn., 109 F.Supp. 565 affirmed 6 Cir., 1954, 218 F.2d 818 and Roberts v. American Fire and Casualty Co., D.C.Tenn., 89 F.Supp. 827 affirmed 6 Cir., 1950, 186 F.2d 921. In each of the cases the facts established, and the Court found, that the insured had no reasonable probability of escaping liability in the original negligence action. Accordingly, the bad faith questions were properly considered in the later actions.

On the basis of the foregoing decisions it appears that the law of Tennessee is that bad faith cannot exist when there is a reasonable probability that the insured will not be found negligent, or that recovery against him may be held below the policy limits. This rule may now be applied to the instant factual background.

The principal defenses upon which counsel intended to rely in the actions against Wood were sudden emergency and contributory negligence as to Sewell Avery.

On the matter of sudden emergency, counsel had the two statements of Wood himself in which he absolved himself from liability and stated the accident was unavoidable. The police report of the accident was in accord with Wood's statements. Mrs. Avery in her statement also said that Wood had no place to go and could not avoid hitting her.

The physical facts supported the conclusions contained in the statements. Wood stated that the unknown vehicle was travelling at about 50–70 miles per hour and that he was travelling about 25–30 miles per hour. Taking the minimum speeds, the vehicles were approaching each other at 108 feet per second, and at the maximums at 144 feet per second. For the sake of argument an average figure of 126 feet per second will be adopted. Wood told the insurance company he first saw the oncoming vehicle 50–60 feet away. This would mean he had less than one-half second to react in order to avoid a headon collision. In his statement to the Avery's attorney Wood fixed the distance at about 200 feet. Even at that distance he would have had under two seconds to get out of the path of the oncoming vehicle. It is true that in her statement Mrs. Avery fixed the distance at 200 yards, but she said that she was not a good judge of distance, and thereafter denied having stated any definite distance in feet.

With this information at hand attorney Owens stated that "I thought he [Wood] was a typical and classical example of the defense of sudden emergency."[2] It is true that he was aware of the somewhat contradictory statement given by Wood to the Averys' attorney, and the hearsay declaration in the statement taken from Sewell Avery that Wood

2. The record shows that in the trial of the present action in the District Court attorney Owens was cross-examined with reference to his knowledge of and participation in the Hammond case in the Tennessee courts. In the course of his cross-examination, questions were asked which brought out that the defense in the Hammond case was also sudden emergency, that they failed to prevail upon it in the injury action and that the insurance company was thereafter held liable for an excess verdict. This examination was objected to, but has not been assigned as error in this Court and accordingly cannot be considered as a ground for reversal. The success or failure of appellant with respect to defenses raised by it in unrelated cases with different parties in other courts had no bearing on any factual issue in the present case. The injection of such irrelevant matter in the present case could operate only to inflame or prejudice the jury against appellant.

had said he could have avoided the accident by dropping back. However, the conclusion that the accident could have been avoided was conjectural and difficult to reconcile with the physical facts, and Wood had affirmed his statement absolving himself of liability on the day the trial of the injury actions began in the State Court. Here, it may be noted that at no time did Owens recommend to appellant that it settle the cases.[3]

The defense predicated on Sewell Avery's intoxication rested on a weaker factual foundation. There was only Wood's statement and that of Officer Owen that Avery was intoxicated. No police or hospital records reflected that fact.

This was the status of the appellant's knowledge prior to trial. It is my opinion that on these facts it must be said that there existed, under the emergency doctrine, a reasonable probability of absolving Wood from liability for negligence.

As it turned out, both of the defenses collapsed in the Circuit Court. The insurance company argues that this was due in no small part to the fact that Wood did not testify in accord with his previous statements to it. Whereas Wood had always maintained to the insurance company that he could not have avoided the accident, he admitted to the jury that he could have.

The Court quotes testimony of attorney Owens on cross-examination to the effect that there were no material discrepancies in Wood's testimony and that he "went down the line" with his story. This should be supplemented by the following question and answer of attorney Owens:

"Q. And you just said that it wasn't a material variance. A. It was enough to lose his case, and of course that is confirmed. It was not only my opinion."

Attorney Owens statements, in his letter to the Claims Supervisor that Wood's testimony "was not what we hoped it would be" and that Wood was "reluctant to * * * indicate that it actually forced him into the Avery vehicle" strike me as not being an overstatement in view of the fact that Wood, in his testimony in the trial of the injury actions virtually admitted his own negligence.

Mrs. Avery claimed that her statement was inaccurately taken, and that she signed it without reading it. Her testimony in the Circuit Court on the material facts was likewise at a variance with the recitals contained in her statement. The Court considers her statement to be of no evidential value whatever, due to her repudiation of it at this trial. There is no evidence in the record that the "Home Office" of the insurance company or attorney Owens were cognizant of the falsity of the statement and of Mrs. Avery's ignorance of its contents, as she claimed. In evaluating the advisability of settlement those persons charged with making the decision could only consider a signed statement of said plaintiff absolving the insured from liability. Bad faith cannot be attributed to their failure to take into account that Mrs. Avery at the trial might change her signed statement.

On the issue of intoxication, Wood's testimony in the Circuit Court was equivocal, whereas to the insurance company he had taken a firm stand. He failed to back up his original version of the extent and nature of Sewell Avery's drinking on the night of the accident. Officer Owen did testify that in his opinion Avery was drunk at the time of the accident. However, Police Lt. Murphy M. McCrary testified on behalf of the Averys, and it developed that he was in fact the first officer at the scene of the accident, although his name did not appear on the police report. Wood never

---

3. Two reputable and experienced trial lawyers of the Tennessee bar testified in behalf of appellant as expert witnesses. Each gave his opinion in answer to a hypothetical question that there was no negligence or bad faith on the part of the appellant in the handling of the case. One of them testified that he would not have recommended that the settlement demand be paid.

told the insurance company or counsel of having seen or spoken with Lt. McCrary. The lieutenant testified that in his opinion Sewell Avery was not intoxicated when he saw him. Both Mr. and Mrs. Avery testified that he was completely sober.

It was on this evidence that the verdicts against Wood were returned in the injury cases. It is an inescapable conclusion that the reasonable probability of Wood escaping liability that existed at the outset of the trial dissolved in the acid bath of the testimony actually given therein which was inconsistent with the prior statements in the possession of the insurance company.

Based on the inconsistency of Wood's testimony to his statements, and the testimony of attorney Owens to the effect that Wood failed to cooperate in the defense of the actions in the Circuit Court, the trial judge in this action submitted to the jury the question of whether Wood had fulfilled his duty of cooperating with the insurance company.[4]

Before going on, an interesting paradox is presented here. Wood claimed that he did not know he was in fact making a statement at the time he was visited by the Averys' attorney. The record shows that he was introduced to the stenographer and that it was explained to him that she was going to record his answers. The explanation for this was that Mr. Wood had only an eighth grade education, carrying with it the inference that he was of limited intelli-

gence. For one with such an intellectual background he showed a remarkable presence of mind in attempting to protect himself from an excess judgment. Not only did he personally maintain the position that the appellant should settle the Averys' claims, but he went so far as to have Mr. Robert G. McLean, an attorney in Alamo, Tennessee, write attorney Owens six days before the trial of the injury actions began making demand on Wood's behalf that the cases be settled within the policy limits and stating that in the event they were not settled Wood would look to appellant for any judgment in excess of his policy limits.[5] It is interesting to note that while Wood was familiar with the legal concept of excess of liability for a bad faith failure to settle he apparently didn't know the correct name of his insurance carrier, having advised attorney McLean that it was "Farm Bureau." However, I must consider the matter on the basis that the idea originated with Wood, although it may also be noted that some three months earlier the Averys' attorney had cited the Hammond decision to attorney Owens in a letter setting forth their demands for settlement.

In the cases of Hall v. Preferred Accident Ins. Co., 5 Cir., 1953, 204 F.2d 844, and State Auto Mutual v. York, 4 Cir., 1939, 104 F.2d 730, it was held that where the insured gave inconsistent statements to his insurance company a claim of bad faith failure to settle would not lie. The principle of the York case is applicable here. In that case suit was

4. It would appear from his charge that the District Judge submitted this issue as an affirmative defense to an action on the insurance contract. He also stated at the beginning of his charge that "this * * * is a breach of contract suit against the defendant." In my judgment, an action of this nature is one sounding in tort. The insurance company had no contractual obligation to settle the claims and could only be held liable on a finding of bad faith, a tortious course of conduct. However, no exception was taken to these portions of the charge. Properly, the matter of cooperation should have been submitted to the jury as an

element to consider in determining whether the insurance company acted in bad faith.

5. At the time attorney McLean wrote attorney Owens, McLean had no knowledge of the facts of the accident. He did not see Mr. Wood at all, only speaking with him over the phone, and never saw or spoke to him again after writing the letter. In response to the letter from attorney Owens inquiring if he had any knowledge of the facts of the accident attorney McLean replied, "If Wood states that he is or was not negligent, of course I can understand why you could not recommend a settlement."

brought both to compel payment of the stated policy limit and also to recover the amount of excess judgment for a bad faith failure to settle. As to the action on the policy itself the insurance company set up the defense of collusion. The insured's original statement was to the effect that the accident was unavoidable, but as the personal injury trial grew near, and at the trial, he changed his story so as to indicate probable negligence on his part. The court held, in the action against the insurance company for excess liability, that as the evidence in that action was sufficient to frame a jury issue on the question of collusion "it cannot be said that the defendant was acting either in bad faith or negligently in refusing to accept the offer of settlement made by plaintiff." id. at page 734. By analogy, where there was sufficient evidence on the question of lack of cooperation, in part based on the variance between Wood's statements and testimony, to take the matter to the jury, it cannot be said that the insurance company was acting in bad faith in failing to settle.

Taken in this frame of reference the action of the insurance company in rejecting the offers of settlement, and the statements by its representatives made in conjunction therewith, cannot operate to make this case one of liability for a bad faith failure to settle.

Without going into any extended recital of what was said and done by appellant's representatives, suffice it to say that in the context of this entire controversy, for the most part, they manifested the position that the insurance company was not going to settle for its full policy limits in a case which they felt presented a doubtful question of liability. This is more a reflection of sound business judgment than of bad faith.

Reference was made to a letter sent to Wood concerning the possibility of a verdict in excess of the policy limits. This was explained quite simply. In every case in which one of appellant's insureds is sued for an amount in excess of his policy limits he is advised of that fact and informed that he may retain counsel of his own choosing to represent him as to any uninsured liability.

Appellee also relies on testimony of Wood as to a conversation with adjuster Leathers in September 1957, in which Leathers "told me he was afraid Mr. Avery and them was going to get more than the policy covered" and as to anything over the policy "you are going to be held responsible for it."

This must be considered in the light of the letter written by attorney Owens to the insured with respect to the right of the latter to engage his own attorney to represent him as to his uninsured liability. There was nothing in the statement adjuster Leathers had originally taken from Wood to indicate any liability, much less a probability as distinguished from a mere possibility, which would result in a substantial judgment against Wood. And it must be remembered that attorney Owens had never recommended settlement in these cases to the insurance company, although it had been his practice to make such recommendations when the case warranted, which he testified were usually adopted by his client.

The Court's attention is also drawn to a statement made by attorney Owens to Wood, following the rendition of the jury verdicts in the Avery suits, which is characterized as "callous" and reflective of appellant's general bad faith. While the statement is susceptible of several interpretations, one could hardly expect attorney Owens to greet Wood with open arms feeling, as he did, that Wood had "thrown" a case that should have been won.

In the final analysis, it is my opinion that the Court has extended the possibility of finding bad faith on the part of an insurance company into an area where no such dereliction of duty properly exists. The day the trial of the per-

sonal injury actions commenced the insurer was possessed of statements by its insured, a statement by a plaintiff and a police report indicating a no liability case. The police report stated that the two claimants had confirmed the fact that a vehicle came across the center line of Park Avenue and was coming headon at Wood's car. It was also aware of another statement by its insured which indicated possible negligence and a hearsay statement by another claimant (the one who recovered the verdict in excess of the policy limits) to the same effect. The physical facts supported a conclusion of unavoidable accident. To hold that under those circumstances a jury may speculate on whether the insurance company was guilty of bad faith leaves me with the fear that the door is being opened to assertions of bad faith in almost every case involving excess claims, except where the proofs in the hands of the insurance company establish an iron-clad defense to an action against its insured. It would operate to extend the policy limits beyond the protection which the insured paid for. It is, in my judgment, a retreat from the "reasonable probability" test adopted by the Tennessee courts.

In my opinion, Wood should be bound by the two signed statements he gave to the insurance company, the latest being on the very day of the commencement of the trial of the injury cases in the Circuit Court of Tennessee. In both of these statements Wood asserted that he could not have avoided the accident and completely absolved himself from all blame. I am not in favor of compensating him since he either misled the insurance company (if his statements were inaccurate or incomplete) or the court and jury (if his statements were true).

In pointing out the duty owing by the insurer to the insured, I do not think we should overlook the correlative duty owing by the insured to the insurer to cooperate with the insurer instead of the claimant and above all to be truthful.

I would reverse the judgment below.

